## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

LARRY MAYS,                )
       Plaintiff,       )
                  )
v.                   )    No.:  3:09-CV-6
                  )          (VARLAN/GUYTON)
TENNESSEE VALLEY AUTHORITY,  )
       Defendant.     )
                  )
————————————————  )

MARY MARGARET BLANCHARD, et al.,  )
       Plaintiffs,      )
                  )
v.                   )    No.:  3:09-CV-9
                  )          (VARLAN/GUYTON)
TENNESSEE VALLEY AUTHORITY,  )
       Defendant.     )
                  )
————————————————  )

ROBERT O. GILTNANE, et al.,   )
       Plaintiffs,      )
                  )
v.                   )    No.:  3:09-CV-14
                  )          (VARLAN/GUYTON)
TENNESSEE VALLEY AUTHORITY,  )
       Defendant.     )
                  )
————————————————  )

JOT RAYMOND, et al.,      )
       Plaintiffs,      )
                  )
v.                   )    No.:  3:09-CV-48
                  )          (VARLAN/GUYTON)
TENNESSEE VALLEY AUTHORITY,  )
       Defendant.     )
————————————————  )

ANITA AUCHARD, et al.,
     Plaintiffs,

v.                                   No.:  3:09-CV-54
                                          (VARLAN/GUYTON)

TENNESSEE VALLEY AUTHORITY,
     Defendant.

_____

LEE SCOFIELD, et al.,
     Plaintiffs,

v.                                   No.:  3:09-CV-64
                                          (VARLAN/GUYTON)

TENNESSEE VALLEY AUTHORITY,
     Defendant.

_____

VICKI LONG, et al.,
     Plaintiffs,

v.                                   No.:  3:09-CV-114
                                          (VARLAN/GUYTON)

TENNESSEE VALLEY AUTHORITY, et al.,
     Defendants.

_____

## MEMORANDUM OPINION AND ORDER

These civil actions are before the Court on Defendant TVA's Motion to Dismiss or for Summary Judgment (the "Motion to Dismiss or for Summary Judgment") [Doc. 41][1] and the Motions to Dismiss All Claims for Punitive Damages Against TVA and to Strike All Jury Demands Against TVA (the "Motion to Dismiss Punitive Damages and Strike Jury

---

[1] Unless otherwise specified, all docket entry notations are numbered according to the docket entry sheet in *Anita Auchard, et al. v. TVA*, 3:09-CV-54.

Demand") [Doc. 58], filed by defendant Tennessee Valley Authority ("TVA"). This litigation consists of the seven captioned cases listed above—four separately filed class action complaints and three non-class action complaints—all filed against TVA and all relating to the December 22, 2008 dike failure and coal ash spill at the Swan Pond facilities at TVA's Kingston Fossil plant in Roane County, Tennessee (the "Swan Pond facilities").

In the Motion to Dismiss or for Summary Judgment [Doc. 41], TVA moves the Court, pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss all tort claims filed against it by Plaintiffs[2] in the seven captioned cases for lack of justiciability on grounds of the federal discretionary function doctrine and failure to state a claim for which relief can be granted. Alternatively, and pursuant to Federal Rule of Civil Procedure 56, TVA moves the Court for summary judgment on all Plaintiffs' tort claims. TVA has also moved to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), the inverse condemnation claims filed against it by the *Blanchard* plaintiffs, the *Raymond* plaintiffs, and the *Scofield* plaintiffs.

In the Motion to Dismiss Punitive Damages and Strike Jury Demand [Doc. 58], TVA moves the Court to dismiss all claims for punitive damages asserted by Plaintiffs on grounds that, pursuant to Federal Rule of Civil Procedure 12(b)(6), punitive damages may not be recovered against TVA because Congress has not expressly authorized such damages against

---

[2] For ease of reference, the plaintiffs in these seven cases will hereinafter be collectively referred to as "Plaintiffs." If the Court is referring to a particular plaintiff or plaintiffs in a specific case, the Court will refer to "plaintiffs," preceded by an abbreviated case name—i.e., the *Auchard* plaintiffs.

TVA.  TVA also moves the Court, pursuant to Federal Rule of Civil Procedure 12(f), to strike Plaintiffs' demands for a jury because there is no right to a jury trial against TVA in these cases.[3]

## I.  BACKGROUND AND FACTS

TVA is a corporate agency and instrumentality of the United States created by and existing pursuant to the Tennessee Valley Authority Act of 1933 (the "TVA Act").  *See* 16 U.S.C. §§ 831, *et seq.*; *see also Hill v. United States Dep't of Labor*, 65 F.3d 1331, 1333 (6th Cir. 1995).  TVA was created by Congress "in the interest of the national defense and for agricultural and industrial development, and to improve navigation in the Tennessee River and to control the destructive flood waters in the Tennessee River and Mississippi River Basins." 16 U.S.C. § 831.  Through amendments to the TVA Act, Congress extended TVA's purposes to "law enforcement . . . in the area of jurisdiction," *Id.* § 831c-3(a), and "[t]o aid further the proper use, conservation, and development of the natural resources of the Tennessee River drainage basin and of such adjoining territory as may be related to or materially affected by the development consequent to this chapter, and to provide for the general welfare of the citizens of said areas . . . ." *Id.* § 831u; *see also United States ex rel. TVA v. Welch*, 327 U.S. 546, 553-54 (1946).  The TVA Act also specifically authorizes TVA

---

[3] The Court will refer to the plaintiffs whose claims are at issue in the Motion to Dismiss Punitive Damages and Strike Jury Demand as "Plaintiffs."  However, this will not include the *Mays* plaintiff as he has not alleged a punitive damages claim against TVA [*see Mays* Complaint, Doc. 1].  The *Auchard* plaintiffs did not assert a claim for punitive damages in their initial complaint but have filed a proposed amended complaint [Doc. 108] which contains a claim for punitive damages and also moves the Court to add additional plaintiffs [*see* Doc. 108].  TVA has filed a response in opposition to the *Auchard* plaintiffs' proposed amended complaint [*see* Doc. 110].

"[t]o produce, distribute, and sell electric power." 16 U.S.C. § 831d(l); *see also Memphis Power & Light Co. v. City of Memphis*, 112 S.W.2d 817, 822 (Tenn. 1937) (stating that "[t]he TVA is a public instrumentality and holds the electric energy generated at its dams in trust for the people of the whole country"). In addition, the TVA Act gives TVA the power to exercise the right of eminent domain, to acquire real estate, and to take title to real estate in the name of the United States to accomplish the purposes of the TVA Act, including "the construction of dams, reservoirs, transmission lines, power houses, and other structures, and navigation projects . . . ." 16 U.S.C. §§ 831c(h)-(i).

In 1939, pursuant to the TVA Act, Congress authorized construction of the Watts Bar Project, a project which included the Watts Bar Dam, lock, hydroelectric plant, and the Watts Bar Reservoir [Doc. 44-1, pp. 94-95].[4] Congressional appropriations for the Watts Bar Project included funds for the purchase of approximately 49,500 acres of land for the Watts Bar Reservoir [*Id.*, p. 98]. TVA's purchase of the Watts Bar Reservoir included the land underlying what is known locally as the Swan Pond embayment and its shoreline strip [*Id.*, p. 99]. In 1951, Congress appropriated funds for the construction of the Kingston Fossil Plant (the "KIF plant"), a coal-fired electricity generation plant [Doc. 44-1, pp. 101-02].[5]

---

[4] Citations to background facts from docket entry 44-1, pages 93 through 99, are from *The Watts Bar Project, Technical Report, No. 9*, published by TVA in 1949 [*see* Doc. 41, p. 9 n.13]. This report is one of a series of published technical reports documenting the planning, design, construction, costs, and operations of various TVA projects [*see id.*].

[5] Citations to background facts from docket entry 44-1, pages 101 through 103, are from *The Kingston Steam Plant, Technical Report No. 34*, published by TVA in 1965 [*see* Doc. 44, p. 10 n.14].

That same year, TVA acquired, in the name of the United States, a peninsula at the confluence of the Clinch and Emory River embayments of the Watts Bar Reservoir [*Id.*]. Construction of the KIF plant began on that peninsula in 1951 [*Id.*]. The KIF plant produced coal ash, a byproduct of when coal is burned for electricity generation [*Id.*]. TVA selected Swan Pond, located immediately north of the peninsula, as the disposal site for the coal ash byproduct [*Id.*, p. 102].

Swan Pond consists of a main ash pond, a dredged ash disposal area, and a stilling pool [Doc. 44-1, p. 164].[6] Coal ash produced at the KIF plant is transported to the main ash pond as slurry[7] through two sluice channels, one for coarser bottom ash and one for finer fly ash [*Id.*]. When the slurry flows through the sluice channels, the coarser bottom ash settles to the bottom [*Id.*]. This coarse bottom ash is then removed from the sluice channels through mechanical means, such as drag lines, and used for dike construction [*Id.*]. The finer fly ash flows through the sluice channels and into the main ash pond where it is dredged, normally by hydraulic means, and deposited in the ash disposal area, which is further divided into dredge cells by internal dikes [*Id.*]. Excess water in the dredged ash disposal area drains back to the main ash pond and then to the stilling pool [*Id.*]. The excess water then flows through the discharge channel and into the KIF plant's water intake channel, and then into

---

[6] Citations to background facts from docket entry 44-1, pages 155 through 176, are from TVA's Operations Manual Dredge Cell Lateral Expansion, Tennessee Valley Authority Kingston Fossil Plant, revised on July 28, 2006 [*see* Doc. 44-1, pp. 155-76].

[7] Slurry is the term for coal ash combined with water.

the Watts Bar Reservoir [*Id.*]. Excess water seeps down through the finer fly ash in the dredge cells and into the groundwater, which transports it into the Watts Bar Reservoir [*Id.*].

According to TVA, under its inspection program for coal ash disposal at the Swan Pond facilities, stability inspections at the Swan Pond facilities have been conducted since at least 1967 [Doc. 43, ¶ 2].[8] TVA asserts that the reports generated by these stability inspections were reviewed and used by TVA management to evaluate the safety and effectiveness of the Swan Pond facilities and to determine whether the facilities were in compliance with applicable regulations [*Id.*]. TVA also asserts that the Swan Pond facilities were covered by two permits issued by the Tennessee Department of Environment and Conservation ("TDEC"): a National Pollutant Discharge Elimination System permit (the "NPDES permit"), and a Class II Landfill Permit (the "Landfill Permit") [Doc. 44-1, pp. 114, 105].[9] In September 2006, TVA asserts that TDEC approved TVA's request for a major modification of the Landfill Permit, authorizing the continued deposit of coal ash at the Swan Pond facilities up to an elevation of 868 feet [*Id.*, pp. 140, 242]. Since 2000, according to TVA, engineers from TDEC have performed regular inspections of the Swan Pond facilities [*Id.*, p. 287].

---

[8] Declaration of Harold L. Petty [Doc. 43].

[9] The NPDES permit was issued on September 1, 2003, under the Tennessee Water Quality Control Act [Doc. 44-1, p. 114] and the Landfill Permit was issued on September 26, 2000, under the Tennessee Solid Waste Disposal Act [*Id.*, p. 105]. The NPDES permit expired on August 31, 2008 and TVA applied for a renewal on December 3, 2007 [*Id.*, p. 148]. The 2003 permit, in effect pending renewal, was in effect at the time of the coal ash spill on December 22, 2008. *See* Tenn. Comp. R. & Regs. §§ 1200-4-5.-05, 1200-4-5-.11 (2007).

Between 2003 and 2007, TVA asserts that it considered alternatives to the wet coal ash disposal system at the Swan Pond facilities [Doc. 42, ¶ 3] After considering the alternatives, TVA asserts that it made the decision to continue operating the Swan Pond facilities pursuant to a wet coal ash disposal system [*Id.*].  In November 2003, a "blowout," or seepage, occurred in a dike on one side of the dredged ash cells [*Id.*; Doc. 44-2, p. 68]. Following the 2003 blowout, TVA asserts that it consulted with two engineering firms, Parsons Energy & Chemicals Group Inc. ("Parsons E & C") and Geosyntec Consultants, Inc. ("Geosyntec"), to determine the cause of the blowout and to evaluate alternatives to permit the continued use of the Swan Pond facilities [Doc. 43, ¶ 3; Doc. 44-2, p. 68].  Parsons E & C concluded that the 2003 blowout was not due to "slope stability," but to other factors [Doc. 44-1, p. 278].  TVA asserts that after considering the findings of Parsons E & C and Geosyntec, and after evaluating various alternatives, it constructed an additional trench drain system to address the cause of the 2003 blowout [Doc. 43, ¶ 3; Doc. 44-2, p. 7]

Around 2004, TVA asserts that it considered and evaluated various long-term alternatives for the Swan Pond facilities [Doc. 43, ¶ 4]. In furtherance of this long-term analysis, TVA consulted with Parsons E & C who conducted an engineering stability analysis of the Swan Pond dredge cell area and the adjoining main ash pond area [*Id.*].  TVA asserts that Parsons E & C evaluated the safety of continuing to stack fly ash at the Swan Pond facilities from the existing elevation level of 810 feet, up to a future elevation level of 868 feet [Doc. 44-1, p. 242].  Parsons E & C concluded that stacking the fly ash to the proposed elevation of 868 feet was likely to make the area "stable during any stage of construction and

after completion of construction[,] including during the occurrence of the design seismic event." [*Id.*, p. 266]. TVA asserts that in reliance on Parson E & C's evaluation, it submitted an application to TDEC in June 2004 for a major modification of its Landfill Permit [Doc. 43, ¶ 5]. On September 12, 2006, TDEC approved the permit modification [*Id.*; Doc. 44-1, p. 140].

In November 2006, a blowout occurred at the same location as the November 2003 blowout [Doc. 43, ¶ 6]. TVA asserts that it retained Geosyntec to determine the cause of the blowout and to develop alternatives for the disposal of the coal ash [*Id.*]. Eight alternatives were identified, including conversion of the Swan Pond facilities to a dry coal ash disposal system instead of the wet coal ash disposal system [*Id.*]. TVA asserts that the alternatives were ranked according to factors such as cost, reliability, time, regulatory compliance, and the possibility of dike failure [*Id.*, ¶ 6; Doc. 44-2, pp. 74-75]. After using these factors to evaluate the alternatives identified by Geosyntec, TVA asserts that it implemented localized toe drain improvements with additional monitoring, maintenance, and surface water improvements [Doc. 43, ¶ 6; Doc. 44-2, p. 76]. TVA states that coal ash disposal operations at the Swan Pond facilities resumed in 2008 in accordance with the modified Landfill Permit, approved by TDEC on September 12, 2006 [Doc. 43, ¶¶ 6, 7; Doc. 44-2, p. 19]. As of December 22, 2008, the height of the coal ash in the cell area at the Swan Pond facilities had increased from 810 feet, the 2004 elevation level, to an elevation level of 820 feet [Doc. 43, ¶ 7].

On December 22, 2008, one of the coal ash containment dikes at the Swan Pond facilities failed [*see* Doc. 44, pp. 4-5; Doc. 82, p. 12]. As a result of the dike failure, approximately 5.4 million cubic yards of coal ash sludge spilled from the 84-acre containment area of the Swan Pond facilities to an adjacent area of about 300 acres, consisting of primarily the Watts Bar Reservoir, the Clinch and Emory Rivers, and government and privately owned shoreline properties [*see* Doc. 44, pp. 4-5; Doc. 82, p. 12].

Following the coal ash spill, TVA and the Environmental Protection Agency (the "EPA"), responded pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. ch. 103, ("CERCLA"), and the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. pt. 300 (2008) (the "NCP"). During the initial emergency response phase, and pursuant to CERCLA, Executive Order No. 12,580,[10] and the NCP, the EPA delegated its authority to TVA to engage in coal ash removal actions. *See* 42 U.S.C. §§ 9604(a)-(b); *id.* § 9615 (authorizing the President to delegate duties and powers under CERCLA); 40 C.F.R. § 300.5. The EPA terminated the initial emergency response phase on January 11, 2009 and transferred lead agency authority to TVA for further clean-up, removal, and remediation actions [Doc. 44-2, p. 77].

Since January 11, 2009, all coal ash response and removal actions have been within TVA's delegated authority under CERCLA and Executive Order No. 12,580 [Doc. 44-2, p.

---

[10] Executive Order No. 12,580, 52 Fed. Reg. 2923, at (e)(1) (Jan. 23, 1987), 3 C.F.R. 193 (1987 Comp.), *superseding* Executive Order No. 12,316, 46 Fed. Reg. 42, 237 (Aug, 20, 1981) (providing for the delegation of presidential authority under CERCLA to the Administrator of the EPA).

77].  As part of TVA's response and removal actions, TVA asserts that it provided hotel rooms, meals, transportation, and other services to residents whose homes were in the vicinity of the Swan Pond area [*Id.*, pp. 84, 97].  TVA also asserts that it mobilized equipment to help clean and repair waterways and land affected by the spill, that it drained creeks, vacuumed and cleared debris, restored gas and water supply to surrounding homes, sampled air, soil, and water, established a Community Outreach Center in Kingston, and set up an informational website with spill information [*Id.*].  TVA also asserts that it instituted a program to purchase privately owned properties in the immediate area of the spill [*Id.*, p. 145].

On January 12, 2009, in a "coordinated oversight approach" adopted by TDEC and the EPA, TDEC ordered TVA to comply with an order directing it to engage in various spill response and remediation efforts, implement removal measures, assess all of TVA's coal ash disposal facilities, submit reports detailing and analyzing the causes of the dike failure at the Swan Pond facilities, and submit a Corrective Action Plan (the "CAP") [Doc. 44-1, p. 81].  TVA asserts that it has since been acting in compliance with this order.

## II.    THE COAL ASH SPILL INVESTIGATIVE REPORTS

Subsequent to the filing of TVA's Motion to Dismiss or for Summary Judgment, three separate investigative reports regarding the coal ash spill at the Swan Pond facilities were issued.  One, a report by the engineering consulting firm, the "AECOM Root Cause Analysis of TVA Kingston Dredge Pond Failure on December 22, 2008" (the "AECOM Report"), was released on June 25, 2009; two, a report by the law firm McKenna Long & Aldridge LLP,

titled "A Report to the Board of Directors of the Tennessee Valley Authority Regarding Kingston Factual Findings" (the "KIF Report"), was submitted to the TVA board of directors on July 21, 2009; and three, a report by the Office of the Inspector General for TVA, titled, the "Inspection Report, a Review of the Kingston Fossil Plant Ash Spill Root Cause Study and Observations About Ash Management" (the "OIG Report"), was issued on July 23, 2009. Filed with their response brief to TVA's Motion to Dismiss or for Summary Judgment, Plaintiffs filed a summary or complete copy of each of these reports and discussed and cited to the reports in their response brief. In TVA's reply brief, TVA also addressed, discussed, and cited the three investigative reports. Because both TVA and Plaintiffs discuss these three reports in their respective briefs, and because such reports are relevant to the issues addressed by both parties, a short description of the reports follows.

### A.    The AECOM Report

The AECOM Report, issued by AECOM, an engineering consultant firm, was commissioned by TVA in January 2009 for the purpose of establishing the physical root causes (the physical mechanics) of the December 22, 2008 spill [*see* Doc. 91-1, p. 47]. The AECOM Report concludes that four concurrent factors were the most probable root causes for the failure of the coal ash containment dike: (1) an increased load on the dike due to the higher elevation of the ash stack and the continued use of the Swan Pond facilities for coal ash disposal; (2) the setback of the dredge cell dike from the outer containment dike which placed the dredged cell dike over a wet ash foundation; (3) an unusually weak silt/ash "slimes" layer at the bottom of the wet ash foundation; and (4) a lack of consolidation of the

wet ash underlying the dredge cell dike leading to the potential for static liquefaction [*Id.*, pp. 138-40; Doc. 83-2; Doc. 90, pp. 4-5].

## B.    The KIF Report

The KIF Report, issued by a law firm retained by TVA's Board of Directors in January 2009, focused on the facts of the coal ash spill and TVA's management practices relating to the Swan Pond facilities and other similar coal ash disposal facilities [Doc. 82-2; Doc. 91, pp. 3-4]. The purpose of the KIF Report was to "provide a basis . . . to improve TVA's governance, systems and controls to reduce the likelihood of similar . . . incidents[.]" [Doc. 82-2, p. 2]. The KIF Report found that TVA management "did not have adequate systems, control and procedures in place prior to the Kingston Spill" and "TVA's Byproduct Facilities operated pursuant to decades of lore, without formalized standards or procedures" and recommended a "comprehensive TVA remediation program owned by senior management under Board oversight." [*Id.*, p. 32].

## C.    The OIG Report

Following the issuance of the AECOM Report and its root cause analysis, TVA's Office of Inspector General (the "OIG") hired another engineering consultant, Marshall Miller and Associates, Inc. ("Marshall Miller"), to perform an independent review of AECOM's root cause analysis [*see Long* Doc. 140-3, p. 5].[11] The OIG also instructed

---

[11] The copy of the OIG Report filed by the *Auchard* plaintiffs (*Auchard* Doc.84-13) contains only the odd numbered pages of the report. Thus, citations to the OIG Report are to *Long* Doc. 140-3, where a complete copy of the OIG Report was filed.

Marshall Miller to provide observations about the Swan Pond facilities and to report on TVA's management practices related to the Swan Pond facilities [*Id.*]. The OIG Report is the result of that review.

While the OIG Report concurs with the conclusions of the AECOM Report regarding the four most probable root causes contributing to the dike failure, the OIG Report criticizes TVA's decision to limit AECOM's scope of work to a root cause analysis and states that the AECOM Report "overemphasized" and focused disproportionately on the "slimes" foundation layer as one of the most probable root factors/causes of the spill [Doc. 140-3, p. 5]. The OIG Report specifically lists the failure of TVA and the AECOM Report to acknowledge or report on TVA's management practices at the Swan Pond facilities that may have contributed to the December 22, 2008 spill [*Id.*]. The OIG Report found that, "the root cause analysis commissioned by TVA did not investigate what management practices or policies and procedures allowed conditions to advance to the critical stage that precipitated the spill." [*Id.*, pp. 8-9].

## III.    PLAINTIFFS AND PROCEDURAL HISTORY

Following the coal ash spill on December 22, 2008, and during TVA's ongoing removal and remediation efforts, Plaintiffs in the seven captioned cases filed seven separate complaints against TVA. Plaintiffs in the seven cases are differently situated and not all claims are alike. However, Plaintiffs have asserted similar claims and causes of action and each complaint is alike in that each has asserted tort claims against TVA.

In *Larry Mays v. TVA*, 3:09-CV-6 ("*Mays*"), the plaintiff, suing on behalf of himself and others similarly situated, is an individual who claims to be a riparian owner on the Clinch River portion of the Watts Bar Reservoir downstream from the KIF plant [*Mays* Complaint, Doc. 1]. The *Mays* plaintiff seeks to represent a class of persons defined as riparian owners downstream from the KIF plant on the Clinch and Emory River portions of the Watts Bar Reservoir [*Id.*]. In his complaint, the *Mays* plaintiff asserts a claim for private nuisance and seeks compensatory damages [*Id.*].

In *Mary Margaret Blanchard, et al. v. TVA*, 3:09-CV-9 ("*Blanchard*"), plaintiffs are eight individuals who have sued on behalf of themselves and others similarly situated [*Blanchard* Complaint, Doc. 1; *Blanchard* Amended Complaint, Doc. 61]. The *Blanchard* plaintiffs assert causes of action based in tort law—negligence, negligence per se, gross negligence, trespass, nuisance, and strict liability. [*Blanchard* Amended Complaint, Doc. 61]. The *Blanchard* plaintiffs also assert claims for inverse condemnation [*Id.*]. In their complaint, the *Blanchard* plaintiffs seek compensatory and punitive damages and injunctive relief relating to spill remediation, including an order directing TVA to fund medical monitoring [*Id.*].

In *Robert O. Giltnane, et al. v. TVA*, 3:09-CV-14 ("*Giltnane*"), plaintiffs are six individuals and a business who have sued on behalf of themselves and others similarly situated [*Giltnane* Complaint, Doc. 1]. The *Giltnane* plaintiffs seek to represent a class of persons who own property, reside, or conduct business within a 25-mile radius of the KIF plant [*Id.*]. The *Giltnane* plaintiffs assert causes of action in tort—negligent trespass,

15

intentional trespass, negligence, gross negligence, strict liability, nuisance, and negligence per se [*Id.*]. In their complaint, the *Giltnane* plaintiffs seek compensatory and punitive damages and injunctive relief relating to spill remediation, including an order directing TVA to fund medical monitoring [*Id.*].

In *Jot Raymond, et al. v. TVA*, 3:09-CV-48 ("*Raymond*"), plaintiffs are twenty-four property owners in the area of the KIF plant [*Raymond* Second Amended Complaint, Doc. 53; *Raymond* Third Amended Complaint, Doc. 98]. The *Raymond* plaintiffs assert causes of action based in tort law—negligence, negligence per se, gross negligence, trespass, nuisance, and strict liability [*Raymond* Third Amended Complaint, Doc. 98]. The *Raymond* plaintiffs also assert claims for inverse condemnation [*Id.*]. In their complaint, the *Raymond* plaintiffs seek compensatory and punitive damages and injunctive relief [*Id.*].

In *Anita Auchard, et al. v. TVA*, 3:09-CV-54 ("*Auchard*"), plaintiffs are ninety-one individuals who allegedly own property and/or reside in the vicinity of the coal ash spill and have sued on behalf of themselves and eighteen minors [*Auchard* Complaint, Doc. 1; *Auchard* Amended Complaint, Doc. 108]. The *Auchard* plaintiffs assert causes of action based in tort law—public nuisance, statutory public nuisance, private nuisance, trespass, negligence, gross negligence, negligence per se, negligent infliction of emotional distress, intentional infliction of emotional distress, strict liability for ultra-hazardous activity, and increased risk of future harm [*Auchard* Complaint, Doc. 1]. In their complaint, the *Auchard* plaintiffs seek compensatory and punitive damages and injunctive relief relating to spill remediation, including an order directing TVA to fund medical monitoring [*Id.*].

In *Lee Scofield, et al. v. TVA*, 3:09-CV-64 ("*Scofield*"), plaintiffs are eighteen individuals and a farm business [*Scofield* Amended Complaint, Doc. 52; *Scofield* Fourth Amended Complaint, Doc. 99]. The *Scofield* plaintiffs assert causes of action based in tort law—negligence, negligence per se, gross negligence, trespass, nuisance, and strict liability [*Scofield* Fourth Amended Complaint, Doc. 99]. The *Scofield* plaintiffs also assert claims for inverse condemnation [*Id.*]. In their complaint, the *Scofield* plaintiffs seek compensatory and punitive damages and injunctive relief relating to spill remediation [*Id.*]

In *Vicky Long, et al. v. TVA*, 3:09-CV-114 ("*Long*"), plaintiffs are forty-three individuals who own property and/or reside in the vicinity of the KIF plant or do business in the area [*Long* Complaint, Doc. 2; *Long* Amended Complaint, Doc. 191]. The *Long* plaintiffs have sued[12] on behalf of themselves and others similarly situated and seek to represent a class of all similarly situated persons within a 10-mile radius of the KIF plant who have been injured in some way by the ash spill [*Long* Amended Complaint, Doc. 191]. The *Long* plaintiffs assert causes of action based in tort law—negligence, gross negligence, recklessness, willful misconduct, wanton misconduct, negligence per se, trespass, nuisance,

---

[12] In addition to TVA, the *Long* plaintiffs sued Geosyntec and Parsons and the following officers and employees of TVA: Tom Kilgore, Harold Petty, Jamey Dotson, and Chris Buttram (collectively, the "TVA employee defendants") [*Long* Complaint, Doc. 2; *Long* Amended Complaint, Doc. 191]. The *Long* plaintiffs amended their complaint on December 16, 2009 to name as a party defendant WorleyParsons Corporation, individually and as a successor in interest to Parsons [Docs. 190, 191]. The TVA employee defendants filed a motion to dismiss the TVA employee defendants from the *Long* case and to dismiss the *Long* plaintiffs' *Bivens* claim against the TVA employee defendants [Doc. 80]. On March 24, 2010, the Court entered a Memorandum Opinion and Order (the "M & O") [Doc. 218], granting the motion to dismiss the TVA employee defendants and the *Bivens* claim.

ultra-hazardous activity, misrepresentation/fraud, medical monitoring, intentional infliction of emotional distress, and negligence infliction of emotional distress [*Id.*].[13]  In their complaint, the *Long* plaintiffs seek compensatory and punitive damages and injunctive relief relating to spill remediation, including an order directing TVA to fund medical monitoring.

On February 26, 2009, the Court held an initial case management conference [Doc. 45, p. 2].[14]  At the conference, counsel for TVA expressed its intention to file in each pending case a dispositive motion asserting that the federal discretionary function doctrine operates as a complete bar to Plaintiffs' tort claims [*Id.*].  Subsequent to the conference, the Court entered the Initial Case Management Order No. 1 [*Id.*], directing TVA to file its dispositive motion asserting the discretionary function doctrine in all pending cases, together with a consolidated supporting brief [*Id.*].  The Court then ordered Plaintiffs to file a joint brief in response, to be followed by TVA's reply [*Id.*].  To the extent Plaintiffs filed more than one response, the Court permitted TVA to file a separate reply to each separate response [*Id.*, pp. 2-3].  With several small adjustments to the Initial Case Management Order No. 1, the parties have complied with the Court's order.

---

[13] The *Long* plaintiffs also asserted National Environmental Policy Act ("NEPA") claims under the Administrative Procedures Act, 5 U.S.C. §§ 701, *et seq.* (the "APA") [*Long* Complaint, Doc. 2; *Long* Complaint, Doc. 191].  TVA moved to dismiss these NEPA claims for failure to state a claim [Doc. 88].  In the Court's M & O, entered on March 24, 2010 [Doc. 218], the Court also granted TVA's motion to dismiss the NEPA claims from the *Long* case.

[14] The initial case management conference was attended by counsel of record for all seven cases except the *Long* case, which was filed subsequent to the conference [Doc. 45, p. 2].

On April 17, 2009, TVA filed the Motion to Dismiss or for Summary Judgment [Doc. 41] in all cases pending at that time. All Plaintiffs except for the *Mays* plaintiff filed a joint response in opposition [Doc. 82] to TVA's Motion to Dismiss or for Summary Judgment. The *Mays* plaintiff filed a response in opposition unique to his case [*Mays*, Doc. 60], but also manifested his intent to join in and adopt the statement of facts and the legal argument and authorities of Plaintiffs in their joint response in opposition [*Id.*, n.1]. TVA filed a reply to Plaintiffs' joint response [Doc. 91]. TVA's reply also addressed the issues raised in the response filed by the *Mays* plaintiff [*Id.*]. TVA filed a supplemental brief [Doc. 100], to which Plaintiffs responded [Doc. 101]. Plaintiffs filed a supplemental brief [Doc. 103], to which TVA responded [Doc. 104]. TVA then filed another supplemental brief [Doc. 109].

On May 21, 2009, TVA filed the Motion to Dismiss Punitive Damages and Jury Demand [Doc. 58]. TVA's request to the Court to dismiss the punitive damages claims applies to the *Blanchard* plaintiffs, the *Giltnane* plaintiffs, the *Raymond* plaintiffs, the *Scofield* plaintiffs, and the *Long* plaintiffs.[15] TVA's request that the Court strike the jury demands applies to all Plaintiffs in the seven captioned cases. Plaintiffs filed a joint response in opposition [Doc. 77] and two declarations with attached exhibits [Docs. 78, 79]. TVA filed a reply [Doc. 87].

---

[15] The *Mays* plaintiff and the *Auchard* plaintiffs have not asserted claims for punitive damages. However, the *Auchard* plaintiffs have included a request for punitive damages in their proposed amended complaint [*see* Doc. 108-2]. However, as previously stated, the Court will continue to refer to the plaintiffs as "Plaintiffs" and the reader should keep in mind that any mention of "Plaintiffs" in regard to the punitive damages claims does not involve the *Mays* plaintiff or the *Auchard* plaintiffs.

The Court has carefully reviewed the parties' briefs, supporting documents, exhibits, and the relevant law. For the reasons stated herein, TVA's Motion to Dismiss or for Summary Judgment [Doc. 41] will be granted in part and denied in part. TVA's request that the Court grant summary judgment in its favor as to Plaintiffs' tort claims pertaining to the use and maintenance of the Swan Pond facilities is **DENIED** to the extent stated in this Order. TVA's request that the Court grant summary judgment in its favor as to Plaintiffs' tort claims pertaining to TVA's response, cleanup, and remediation activities at the Swan Pond facilities is **GRANTED**. TVA's request that the Court dismiss the inverse condemnation claims in *Blanchard*, *Raymond*, and *Scofield* is **DENIED**. Finally, TVA's Motion to Dismiss Punitive Damages and Strike Jury Demand is **GRANTED** and Plaintiffs' requests for punitive damages against TVA is **DISMISSED** and the Court **STRIKES** Plaintiffs' requests for jury trials.

## IV. TVA'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

In TVA's Motion to Dismiss or for Summary Judgment, TVA asserts that the federal discretionary function doctrine applies to TVA, applies to all Plaintiffs' tort claims, and requires the dismissal of all Plaintiffs' tort claims for lack of justiciability and failure to state a claim for which relief can be granted. Alternatively, TVA requests that the Court grant summary judgment in favor of TVA as to all Plaintiffs' tort claims. TVA also asserts that the inverse condemnation claims of the *Blanchard* plaintiffs, the *Raymond* plaintiffs, and the *Scofield* plaintiffs should be dismissed for failure to state a claim upon which relief can be granted.

In opposition, Plaintiffs assert that the federal discretionary function doctrine is not applicable to TVA and Congress expressly waived TVA's sovereign immunity with its inclusion of the "sue and be sued" clause in the TVA Act. *See* 16 U.S.C. § 831c(b). Alternatively, Plaintiffs assert that even if the discretionary function doctrine is sometimes applicable to TVA, it is not applicable to these cases because the conduct challenged by Plaintiffs involves TVA's power program activities, which Plaintiffs assert are commercial activities, not activities conducted as part of TVA's governmental function. Plaintiffs then assert that if the Court determines that the discretionary function doctrine should apply to TVA, it does not apply to these cases because the conduct challenged by Plaintiffs is not the type of conduct covered by the discretionary function doctrine. Plaintiffs also assert that the Clean Water Act (the "CWA"), 33 U.S.C. §§ 1251, *et seq.*, and the Resource Conservation and Recovery Act (the "RCRA"), 42 U.S.C. §§ 6901, *et seq.*, contain waivers of sovereign immunity which authorize Plaintiffs' tort claims against TVA. Finally, the *Blanchard* plaintiffs, the *Raymond* plaintiffs, and the *Scofield* plaintiffs assert that they have amended their claims for inverse condemnation in their respective complaints and the amended claims are sufficient to state inverse condemnation claims.

On a motion to dismiss for lack of justiciability pursuant to Federal Rule of Civil Procedure 12(b)(1), a court will determine whether the allegations of the complaint are sufficient to confer subject matter jurisdiction on the court. *See* Fed. R. Civ. P. 12(b)(1). On a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), a court is charged with determining if the facts in the complaint state a valid claim,

and the court is not to look beyond the facts alleged in the complaint. *See* Fed. R. Civ. P. 12(b)(6); *Ascroft v. Iqbal*, – U.S. –, –, 129 S. Ct. 1937 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). On a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, a court may look beyond the complaint to determine whether the undisputed facts in the record support judgment as a matter of law for one party or another. *See* Fed. R. Civ. P. 56.

Given the substantial record of pleadings, briefs, reports, exhibits, and documents that have been filed in this litigation, and the Court's consideration of such filings, the Court will consider TVA's request that all Plaintiffs' tort claims be dismissed under the discretionary function doctrine as a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. TVA's request that the inverse condemnation claims be dismissed will be considered pursuant to Federal Rule of Civil Procedure 12(b)(6), as will TVA's request that Plaintiffs' punitive damages claims be dismissed.

## V. ANALYSIS OF THE DISCRETIONARY FUNCTION DOCTRINE

### A. Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). The court must view the facts and all inferences to be drawn therefrom in the light

most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248. The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the fact finder. *Id.* at 249. The judge does not weigh the evidence, judge the credibility of witnesses, nor determine the truth of the matter. *Id.* Thus, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

## B.     The Applicability of the Discretionary Function Doctrine to TVA

The TVA Act designates TVA as "an instrumentality and agency of the Government of the United States[.]" 16 U.S.C. § 831r. The United States Supreme Court has recognized TVA's status as a federal agency. *See Ashwander v. TVA*, 297 U.S. 288, 315 (1936) (referring to TVA as "an agency of the federal government"). The United States Court of Appeals for the Sixth Circuit has held similarly. *Matheny v. TVA*, 557 F.3d 311, 320 (6th Cir. 2009) (stating that "TVA is a 'wholly-owned corporate agency and instrumentality of

the United States'") (quoting *Edwards v. TVA*, 255 F.3d 318, 322-23 (6th Cir. 2001) (quoting *Hill*, 65 F.3d at 1333)).[16] Congress[17] and the executive branch[18] have also affirmed TVA's status as a federal agency within its various corporate roles and functions. TVA has authority to exercise the power of eminent domain in the name of the United States and to acquire property deemed necessary to accomplish the purposes of the TVA Act. *See* 16 U.S.C. §§ 831c(h)-(i). The TVA Act also specifically authorizes TVA "[t]o produce, distribute, and sell electric power," 16 U.S.C. § 831d(l), and authorizes TVA to operate and manage properties in furtherance of the purposes of the TVA Act, 16 U.S.C.§ 831c(h).[19] TVA employees are covered by the Civil Service Reform Act (the "CSRA")[20] and the Federal

---

[16] Other decisions of the Sixth Circuit are in accord. *See, e.g., McCarthy v. Middle Tenn. Elec. Membership Corp.*, 466 F.3d 399, 411 n.18 (6th Cir. 2006) (stating that "there is no question that 'TVA is an agency and instrumentality of the United States'"); *Diversified Energy, Inc. v. TVA*, 339 F.3d 437, 444 (6th Cir. 2003) (stating that "TVA, as an agency of the United States, enjoys sovereign immunity unless Congress specifically waives it").

[17] *See, e.g.,* 16 U.S.C. § 831r (denominating TVA as "an instrumentality and agency of the Government of the United States" in the context of giving TVA access to the United States Patent and Trademark Office for the purpose of studying, ascertaining, and copying certain information). *See also and compare* 16 U.S.C. § 831c-2 (granting tort immunity to TVA employees), *with* the Federal Employees Liability Reform and Tort Compensation Act of 1988, Pub. L. No. 100-694, 102 Stat. 4563 (1988), 28 U.S.C. §§ 2679(b)-(d) (granting tort immunity to federal agency employees).

[18] *See, e.g.,* 18 C.F.R. § 1300.101 (stating that "[e]mployees of [TVA] are subject to the executive branch-wide standards of ethical conduct at 5 CFR part 2635 . . . .").

[19] *See, e.g.,* 16 U.S.C.§ 831c(h) (giving TVA the power to acquire real estate and stating that "such real estate shall be entrusted to [TVA] as the agent of the United States to accomplish the purposes of this chapter").

[20] *See* the Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, 92 Stat. 111 (codified in various sections of 5 U.S.C. §§ 1101, *et seq.*); *see also Alder v. TVA*, 43 F. App'x. 952, 956-57 (6th Cir. 2002) (noting that the CSRA applies to TVA employees).

Employees Compensation Act ("FECA").[21]  The EPA has also recognized TVA's status as a federal agency by its designation of TVA as "lead federal agency" under the NCP and in relation to TVA's response and remedial activities following the December 22, 2008 coal ash spill.  *See* 40 C.F.R. § 300.5 (explaining the term "lead agency").[22]  Finally, this Court has previously held that TVA is a federal agency.[23]  Thus, in accordance with this statutory, legislative, and precedential authority, and consistent with this Court's prior holdings, this Court concludes that TVA is an instrumentality and agency of the federal government.

---

[21] *See* the Federal Employees Compensation Act, 5 U.S.C. §§ 8101, *et seq.* ("FECA"); *Lockhart v. Heede Intern., Inc.*, 445 F. Supp. 28, 30 (D.C. Tenn. 1977) (stating that "[i]t is undisputed that TVA is an agency and instrumentality of the United States and that the benefits of [FECA] extend to employees of TVA"); *Jones v. TVA*, 948 F.2d 258, 265 (6th Cir. 1991) (discussing § 831b of the TVA Act and stating that, in accordance with the TVA Act, TVA employees who are injured in the course and scope of their employment receive benefits under FECA and such benefits are exclusive and preclude recovery against TVA under state law).

[22] *See* 40 C.F.R. § 300.5 (stating that "[l]ead agency means the agency . . . to plan and implement response actions under the NCP" and "[w]here the release is on, or the sole source of the release is from, any facility or vessel under the jurisdiction, custody, or control of a federal agency, other than the EPA . . . then that agency will be the lead agency for remedial actions and removal actions other than emergencies").

[23] *See, e.g., Hendricks v. Governor's Taskforce for Marijuana Eradication*, No. 3:05-CV-377, 2007 WL 3396480, at *3 (E.D. Tenn. Nov. 14, 2007) (stating that "TVA is a federal agency and therefore not subject to a § 1983 suit as it is not a state actor"); *Fortner v. TVA*, No. 3:04-CV-363, 2005 WL 2922190, at *2 (E.D. Tenn. Nov. 4, 2005) (stating that "TVA is a corporate agency and instrumentality of the United States"); *Quality Tech. Co. v. Stone & Webster Eng'g Co.*, 745 F. Supp. 1331, 1339 (E.D. Tenn. 1989) (stating that "[a]s has been declared by many courts, the TVA is a federal government corporation–'an agency performing wholly governmental services, and is an instrumentality of the United States'" (citations omitted)), *aff'd*, 909 F.2d 1484 (6th Cir. 1990) (table).

The discretionary function doctrine generally arises in the context of the Federal Tort Claims Act, 28 U.S.C. § 2680(a), (the "FTCA"), where Congress provided that the waiver of sovereign immunity by the United States does not extend to

> Any claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). TVA does not benefit from the discretionary function doctrine as it is embodied in the FTCA. Rather, TVA's waiver of sovereign immunity is through the "sue and be sued" clause in its own enabling legislation. In addition to the articulation of specific powers and purposes in the TVA Act, the Act also provides that TVA "[m]ay sue or be sued in its corporate name." 16 U.S.C. § 831c(b). Both the Supreme Court and the Sixth Circuit have interpreted this language as "making the TVA liable to suit in tort, subject to certain exceptions." *United States v. Smith*, 499 U.S. 160, 168-69 (1991) ( citing *Peoples Nat. Bank of Huntsville, Ala. v. Meredith*, 812 F.2d 682, 684-85 (11th Cir. 1987)); *see also Queen v. TVA*, 689 F.2d 80, 85 (6th Cir. 1982), *cert. denied*, 460 U.S. 1082 (1983).

"Sue and be sued" clauses are presumed to be broad waivers of sovereign immunity unless it is "clearly shown that certain types of suits are not consistent with the statutory or constitutional scheme, [and] . . . an implied restriction of the general authority is necessary to avoid grave interference with the performance of a governmental function, or that for other reasons it was plainly the purpose of Congress to use the 'sue and be sued' clause in a narrow sense." *FHA v. Burr ("Burr")*, 309 U.S. 242, 245 (1940) (footnote omitted); *see Loeffler v.*

*Frank*, 486 U.S. 549, 554 (1988) (quoting *Burr*, 309 U.S. at 245); *Fed. Deposit. Ins. Corp. v. Meyer ("Meyer")*, 510 U.S. 471, 480-81 (1994) (quoting *Burr*, 309 U.S. at 245).

Plaintiffs argue that the "sue and be sued clause" of the TVA Act expressly waives any claim TVA may have to sovereign immunity because "sue and be sued" clauses are to be "liberally construed" and subject entities to the liability of a private enterprise.[24]  In opposition, TVA asserts that because TVA is a governmental agency and instrumentality, its amenability was not intended to be, and has been held not to be, identical to that of private entities.  Thus, it is TVA's position that the discretionary function doctrine is applicable to TVA notwithstanding the "sue and be sued" clause of the TVA Act.

While acknowledging that the "sue and be sued" clause in the TVA Act constitutes a "broad waiver of sovereign immunity," the Sixth Circuit has held that "in certain limited situations the TVA is exempt from liability arising out of the exercise of wholly governmental functions, where the TVA acts solely as the Government's agent and where the United States itself would not be liable."  *Edwards v. TVA*, 255 F.3d 318, 322 (6th Cir. 2001) (quoting *Queen*, 689 F.2d at 86);[25] *see also Fortner v. TVA*, No. 3:04-CV-363, 2005

---

[24] *See Meyer*, 510 U.S. at 475, 482-83; *Franchise Tax Bd. of Cal. v. United States Postal Service*, 467 U.S. 512, 520 (1984) (stating that a "sue or be sued" entity's "liability is the same as that of any other business").

[25] In *Edwards*, the plaintiff's son slipped on a rocky shoreline and fell into the Tennessee River near the Fort Loudoun Dam, a dam maintained and operated by TVA . *Edwards*, 255 F.3d at 320.  The plaintiff brought a wrongful death action against TVA, seeking compensatory and punitive damages and arguing that TVA had failed to adequately maintain existing safety measures and failed to take additional safety measures to protect the public.  *Id.* The Sixth Circuit affirmed the judgment of this district court, which had granted summary judgment in favor of TVA on discretionary function grounds.  *Id.* at 325.

WL 2922190, (E.D. Tenn. Nov. 4, 2005);[26] *Peoples Nat. Bank of Huntsville, Ala. v. Meredith*, 812 F.2d 682, 684-85 (11th Cir. 1987). The Sixth Circuit has stated that this non-liability is not an "incident of immunity but the result of the entitlement of the TVA, when it acts solely as a governmental entity." *Queen*, 689 F.2d at 86.[27] This exemption from liability for certain "wholly governmental functions" has been analyzed pursuant to the same analysis as that applied to the immunity resulting from the discretionary function doctrine of the FTCA. *See, e.g., Edwards*, 255 F.3d at 322 (applying the discretionary function doctrine to TVA); *Sligh v. TVA*, 532 F. Supp. 168 (D.C. Tenn. 1980) (same); *Peoples Nat. Bank of Huntsville*, 812 F.2d at 685 (same). Thus, in keeping with the holdings of this Court, and the holdings of other district courts within this circuit, the Court will apply the discretionary function doctrine to TVA when it "acts solely as a governmental entity." *See, e.g., Queen*, 689 F.2d at 86; *Edwards*, 255 F.3d 318; *Sligh*, 532 F. Supp. 168; *Fortner*, 2005 WL 2922190.

---

[26] In *Fortner*, the plaintiffs had launched a fishing boat into the waters near the Fort Loudoun Dam and the boat, with them in it, got caught in the subsurface currents created by the spillway. *Fortner*, 2005 WL 2922190, at *2. Two of the three occupants of the boat drowned. *Id.* The plaintiffs filed a negligence action against TVA for failure to maintain adequate warnings of hidden dangers associated with TVA's operation of the dam. *Id.* at *6. The plaintiffs alleged that TVA was negligent in failing to adequately warn boaters of the hidden dangers created by TVA's operation of the spillway gates. *Id.* at *3. TVA moved for summary judgment on discretionary function grounds. *Id.* at *6. This Court granted TVA's motion for summary judgment on discretionary function grounds, among others. *Id.*

[27] In *Queen*, a TVA engineer appeared on a broadcasting program and expressed a negative opinion regarding the plaintiff's invention, a device intended to reduce the electric bills for consumers of electric power. *Queen*, 689 F.2d at 82-83. The plaintiff brought a common law defamation action against TVA, seeking damages and injunctive relief. *Id.* The Sixth Circuit affirmed the judgment of this district court, granting TVA's motion for summary judgment on discretionary function grounds. *Id.* at 85-86; *see also Queen v. TVA*, 508 F. Supp. 532 (E.D. Tenn. 1980).

Plaintiffs urge the Court not to apply the discretionary function doctrine to Plaintiffs' claims because the challenged conduct at issue—conduct relating to TVA's power programs—does not involve a "wholly governmental" function, and, as a matter of public policy, is not conduct for which TVA should be permitted immunity. TVA asserts that its power program activities are governmental in nature and conduct to which the discretionary function doctrine should apply.

Courts have held that TVA is not liable for conduct related to flood control and navigation. *See Queen*, 689 F.2d at 85-86. Flood control and navigation is conduct Congress explicitly authorized TVA to perform as part of its purpose and function. *See* 16 U.S.C. § 831 (stating that the purpose of TVA is "to improve navigation . . . and to control the destructive flood waters"). The TVA Act also explicitly recognizes TVA's authority "[t]o produce, distribute, and sell electric power," 16 U.S.C. § 831d(l), and to acquire, operate, and maintain lands and structures to carry out the purposes of the TVA Act. *See id.* §§ 831c(h)-(i). In *Queen*, the Sixth Circuit affirmed the application of the discretionary function doctrine to power-related conduct TVA was statutorily authorized to engage in, specifically, the statutory authority "'to make studies, experiments and determinations to promote the wider and better use of electric power for agricultural and domestic use, or for small or local industries.'" *Queen*, 689 F.3d at 84 (quoting TVA's brief which quotes 16 U.S.C. § 831i). In *Edwards*, the Sixth Circuit affirmed a district court's application of the discretionary function doctrine to TVA's conduct in the maintenance of its hydroelectric dams—power-

related conduct—and conduct regarding "how [TVA] . . . make[s] federal lands safe for visitors." *Edwards*, 255 F.3d at 325.

Plaintiffs urge the Court to distinguish between the "commercial" and the "governmental" nature or function of TVA's activities, applying the discretionary function doctrine to the latter but not the former. In doing so, Plaintiffs urge the Court to follow the United States Court of Appeals for the Fourth Circuit in *North Carolina v. TVA*, 515 F.3d 344 (4th Cir. 2008). In *North Carolina*, the Fourth Circuit declined to apply the discretionary function doctrine to TVA in a case involving emissions from TVA's fossil fuel plants because "TVA's power-generating activities are commercial in nature and thus not immune to suit." *North Carolina*, 515 F.3d at 350 n.4.[28]

The Court respectfully disagrees with Plaintiffs' extension of the holding of the Fourth Circuit as it pertains to the facts of these cases, facts involving the failure of a coal ash retainment dike at TVA's KIF plant, a coal-fired electricity plant. As an initial matter, the Court notes that the holding of *North Carolina* is contrary to previous decisions by the Sixth

---

[28] The dissenting member of the panel in *North Carolina* would have held that the discretionary function doctrine was applicable to TVA. *North Carolina*, 515 F.3d at 354 (Niemeyer, J., concurring in part and dissenting in part). "I cannot conclude, that in authorizing the TVA 'to sue and be sued,' Congress intended to traverse separation of powers principles and authorize a State suit against a federal agency questioning the fundamental decisions of the federal government to create the TVA and build coal plants to provide energy and thereby inherently authorize some emissions that are within federal and state regulatory standards." *Id.* at 354-55 (Niemeyer, J.). Further, "[a]llowing such a suit without an explicit waiver of sovereign immunity with respect to discretionary functions is no different than subjecting the federal government to suits in other analogous contexts–which we have recognized is prohibited–such as suits challenging the decision to build a dam across a navigable waterway, or claiming damage caused by the government's decision to change the course of [a river] . . . ." *Id.* at 355 (Niemeyer, J.).

Circuit affirming the application of the discretionary function doctrine to TVA when the challenged conduct relates to the operation of dams, flood control, and electric power production. *See, e.g., Queen*, 689 F.2d at 81-83 (holding that the discretionary function doctrine applies to statements made by a TVA employee regarding TVA's power production function);[29] *Edwards,* 255 F.3d at 324-25 (applying the discretionary function doctrine to TVA's conduct relating to its hydroelectric dams). In addition, this Court will not parse the conduct or activities of TVA into the distinct categories of commercial and governmental conduct because the application of such distinct categories are bound to lead to disparate and inconsistent results.[30] *Indian Towing Co. v. United States*, 350 U.S. 61, 65 (1955), *affirming*, *In re Texas City Disaster Litigation*, 197 F.2d 771 (5th Cir. 1952) (en banc) (refusing to

---

[29] The specific conduct at issue in *Queen* was "statements" by a TVA representative regarding TVA's power program. *Queen*, 689 F.3d at 81-83. Although not directly analogous to this situation, the Sixth Circuit noted that such statements were protected because of the "'statutory mandate directing TVA 'to make studies, experiments and determinations to promote the wider and better use of electric power for agricultural and domestic use, or for small or local industries.'" *Id.* (quoting TVA's brief which quotes 16 U.S.C. § 831i. These statements were made about and in furtherance of TVA's power program.

[30] After concluding that TVA's power production activities are commercial in nature, the court in *North Carolina* noted, citing *Queen v. TVA*, that other courts have found that TVA benefits from the discretionary function doctrine when it engages in governmental functions. *North Carolina*, 515 F.3d at 350 n.4. However, the *North Carolina* court did not provide a clear rationale for its holding that some statutory functions and purposes of TVA are governmental in nature —such as the operation of dams and flood control—and others, while still authorized by the TVA Act, are not, stating only that "[w]hether the TVA retains a measure of sovereign immunity when it engages in a governmental function is not a question we need reach." *Id.* As such, this Court cannot determine the standard upon which the court in *North Carolina* distinguishes commercial versus governmental acts on the part of TVA. *See also North Carolina ex rel Cooper v. TVA*, 439 F. Supp. 2d 486, 492 n.1 (W.D. N.C. 2006) (stating that "courts have taken a careful approach and allowed an exemption for matters related to such things as the operation of dams and other clearly governmental function" and noting that a claim relating to TVA's emission of air pollutants does not fall within the exemption).

apply a governmental or commercial distinction because "it would thus push the courts into the 'non-governmental' – 'governmental' quagmire that has long plagued the law of municipal corporations"); *see also United States v. S.A. Empresa de Viacao Aerea Rio Grandense ("Varig Airlines")*, 467 U.S. 797, 812 (1984). This is especially so when, as here, the challenged conduct and activities are in furtherance of a function that TVA is explicitly authorized to perform by the TVA Act—namely, electric power production and distribution. *See* 16 U.S.C. § 831d(l).

In sum, the Court will consider TVA's status as a governmental agency and instrumentality, and whether its conduct in these cases was in furtherance of activities, a purpose, and a function that TVA was statutorily authorized to pursue. Because TVA was authorized by Congress to "produce, distribute, and sell electric power," 16 U.S.C. § 831d(l), and to use and develop technology for the generation of electric power, Congress made the governmental choice of authorizing TVA to provide communities with various types of electric power. Such conduct in a federally created agency and instrumentality—the exercise of a statutorily authorized purpose—constitutes the exercise of a "governmental function" to which the discretionary function doctrine applies. Accordingly, the Court will apply the discretionary function doctrine to TVA and its conduct relating to its power production purpose and function, thus encompassing the challenged conduct in these cases.

## C.     The *Gaubert* Test

In *United States v. Gaubert*, the Supreme Court established a two-part test to be applied in determining whether a particular claim falls under the discretionary function

doctrine to the federal government's waiver of sovereign immunity. *See United States v. Gaubert*, 499 U.S. 315, 322-25 (1991); *Berkovitz by Berkovitz v. United States ("Berkovitz")*, 486 U.S. 531, 536-37 (1988); *see also Rosebush v. United States*, 119 F.3d 438, 441 (6th Cir. 1997). The first part of the *Gaubert* test requires a determination of whether the challenged act or omission violated a mandatory regulation or policy that allowed no judgment or choice. *Gaubert*, 499 U.S. at 323-24. If so, the discretionary function doctrine does not apply because there was no element of judgment or choice in the challenged conduct. *Id.* at 322. "The requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'" *Id.* (quoting *Berkovitz*, 486 U.S. at 536).

If the challenged conduct is determined to involve an element of judgment, the second part of the *Gaubert* test looks to see "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322-23 (quoting *Berkovitz*, 486 U.S. at 536). "[T]he purpose of the exception is to prevent judicial second guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 323 (citing *Varig Airlines*, 467 U.S. at 814). The exception, when properly construed, protects only governmental actions and decisions based on considerations of public policy. *Id.* (quoting *Berkovitz*, 486 U.S. at 537). "In sum, the discretionary function doctrine insulates the

government from liability if the action challenged in the case involves the permissible exercise of policy judgment. *Berkovitz*, 486 U.S. at 537

In determining whether the discretionary function doctrine applies to the conduct challenged by Plaintiffs in these cases, the first step is to determine exactly what conduct is at issue. *Rosebush v. United States*, 119 F.3d 438, 441 (6th Cir. 1997) (citing *Autery v. United States*, 992 F.2d 1523, 1527-28 (11th Cir. 1993)). TVA asserts that Plaintiffs' tort claims and requests for relief challenge two different kinds of conduct:

> (1)     TVA's continuing maintenance and use of the Swan Pond facilities in the time period leading up to the December 22, 2008 catastrophic dike failure, and

> (2)     TVA's coal ash spill removal and remediation conduct.

[Doc. 41, pp. 30-31]. Plaintiffs do not seem to dispute this classification of the conduct challenged conduct and the Court finds no reason to disagree.

### D.     TVA's Continuing Use and Maintenance of the Swan Pond Facilities

TVA asserts that its conduct in continuing to use and maintain the Swan Pond facilities in the time period leading up to the December 22, 2008 coal ash spill satisfies steps one and two of the *Gaubert* test. TVA argues that Plaintiffs' complaints do not allege that TVA's continued use and maintenance of the Swan Pond facilities violated, or was different from, any mandatory statute, regulation, or policy dictating a specific course of conduct in the use and maintenance of coal ash facilities, thus satisfying the first part of the *Gaubert* test. TVA also argues that its conduct in continuing to use and maintain the Swan Pond

facilities is the type of conduct that is susceptible to policy analysis, thus satisfying the second part of the *Gaubert* test.

In opposition, Plaintiffs argue that TVA cannot satisfy the first part of the *Gaubert* test because TVA's conduct in continuing to use and maintain the Swan Pond facilities constituted violations of federal and state laws and TVA's internal mandatory policies and procedures. Plaintiffs also argue that even if TVA's conduct did not violate a mandatory law, policy, or procedure, its conduct was not based on public policy considerations and thus fails to satisfy the second part of the *Gaubert* test.

>    **1.    Whether TVA's Use and Maintenance of the Swan Pond Facilities was in Violation of a Mandatory Federal Statute, Regulation, or Policy Which Dictated a Specific Course of Conduct**

For purposes of the discretionary function doctrine, a controlling statute, regulation, or administrative policy must dictate a specific course of action relevant to the challenged conduct. *Rosebush*, 119 F.3d at 442; *see Berkovitz*, 486 U.S. at 536 (stating that "the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow"). Thus, the proper inquiry for purposes of the discretionary function doctrine is whether the challenged conduct violated a governing, specific, mandatory directive. For purposes of the first part of the *Gaubert* test, it is not the ultimate result of the challenged conduct and whether that result violated a specific statute, regulation or policy, but whether there was a violation of a specific, mandatory directive in the conduct leading up to the ultimate result. *See, e.g., Varig*

*Airlines*, 467 U.S. 797.[31]  At this stage of the inquiry, the issue of whether the challenged conduct was negligent is irrelevant.  *Rosebush*, 119 F.3d at 442 (citing *Autery*, 992 F.2d at 1527-28).

Plaintiffs claim that TVA's conduct in continuing to use and maintain the Swan Pond facilities violated federal and state laws, regulations, and internal policies and procedures promulgated by TVA.  Because the first part of the *Gaubert* test requires a mandatory statute, regulation, or policy that allows no judgment or choice, the Court now inquires whether any of the statutes, regulations, policies, or procedures cited by Plaintiffs prescribe and require a specific course of conduct which TVA failed to follow.  *Gaubert*, 499 U.S. at 323-24; *Berkovitz*, 486 U.S. at 536.

### a.    The Tennessee Solid Waste Disposal Act and the Tennessee Solid Waste Rules

Plaintiffs allege that TVA violated the Tennessee Solid Waste Disposal Act, T.C.A. §§ 68-211-101, *et seq.* (the "Tennessee Waste Act"), which provides for the promulgation of the Tennessee Solid Waste Rules (the "Tennessee Solid Waste Rules"), Tenn. Comp. R. & Reg. §§ 1200-1-7-.01, *et seq.*  The Tennessee Solid Waste Rules govern solid waste

---

[31] In *Varig Airlines*, the Supreme Court found that because the FAA's conduct did not violate a mandatory, specific directive, the discretionary function doctrine applied even though the *result* of the conduct did not comply with mandatory, specific FAA requirements. *Varig Airlines*, 467 U.S. 797 (emphasis added). *See, e.g., GATX/Airlog Co. v. United States*, 79 F. Supp. 2d 1208, 1213 (W.D. Wash. 1999), *aff'd*, 286 F.3d 1168 (9th Cir. 2002) (stating that "[p]laintiff is attempting, through artful pleading, to present the downstream result of a discretionary decision . . . . Since the underlying cause of this error . . . falls within the discretionary function exception, plaintiff's claim . . . cannot be allowed to proceed: otherwise, private litigants would be able to circumvent the discretionary function exception by suing on a consequent of the discretionary function decision rather than the decision itself.").

disposal in Tennessee and require that solid waste disposal facilities operate in accordance with a permit from TDEC.  *See* Tenn. Comp. R. & Reg. § 1200-1-7-.02(b)(1).  Plaintiffs argue that TVA constructed and operated parts of the Swan Pond facilities without first receiving a permit, that TVA was late in applying for a permit, and that TVA violated the permit application requirements by "failing to describe the hydrogeology of the site adequately." [Doc. 82, pp. 43-45].

In response, TVA asserts that it applied for a permit from TDEC after being informed by TDEC officials that authorization by TDEC was necessary for TVA's operation of the Swan Pond facilities [Doc. 91, pp. 19, 25].  TVA also asserts that the permit application contained all necessary documentation and reports, including a hydrogeology report that met regulatory requirements [Doc. 44-1, p. 106; Doc. 101, p. 11].  TVA points out that TDEC issued a permit for the Swan Pond facilities on September 26, 2000 [*Id.*].[32]  TVA also indicates that the stability analysis and report by Parsons E & C on the Swan Pond facilities was submitted to TDEC as part of TVA's 2006 request for a permit modification and that this

_____

[32] As support for these assertions, TVA points to a memorandum dated October 18, 1994 [Doc. 91-1, p. 19].  The memorandum states that on September 27, 1994, "DSWM [the Division of Solid Waste Management] officials stated that a Class II (Industrial) solid waste permit would be required for the dredge cells . . . [but ] TVA . . . [had] the option of providing a Closure/Post-Closure Plan in lieu of a full Class II permit if TVA could provide hydroelectric data that supported this contention." [*Id.*].  TVA has provided a letter indicating that it submitted the requested Closure/Post-Closure Plan, including a hydrogeology report, on November 29, 1995 [*Id.*, p. 22].  TVA has also provided a letter, dated September 14, 1998, in which TDEC informed TVA that a permit, rather than a Closure/Post-Closure Plan, would be necessary [*Id.*, p. 28; Doc. 110, p. 11].  TVA asserts that it made the necessary submissions for the permit, and TDEC issued a permit for the Swan Pond facilities on September 26, 2000 [Doc. 44-1, p. 106; Doc. 101, p. 11]. TVA has also attached two letters from TDEC, one dated August 9, 1996, and one dated September 14, 1998, stating that TVA's submitted hydrogeology reports met the regulatory requirements [Doc. 91-1, pp. 25-28].

analysis and report appropriately informed the TDEC of the hydrogeology and subterranean foundation conditions at the Swan Pond facilities [Doc. 44-1, p. 244].

Upon review of TVA's submitted exhibits regarding its application for a permit, the permit itself, and the accompanying reports, it appears to the Court that TVA did obtain a permit for the Swan Pond facilities and the documents submitted with the permit application, including the hydrogeology report, complied with the regulatory requirements [Doc. 44-1, p. 106, Doc. 91-1, p. 22]. Accordingly, on the record presently before the Court, and because the Swan Pond facilities were operating pursuant to a permit from TDEC at the time of the coal ash spill, as required by the Tennessee Solid Waste Rules and the Tennessee Waste Act, the Court can determine no violation of a specific mandatory directive or course of conduct dictated by the Tennessee Waste Act or the Tennessee Solid Waste Rules in TVA's use and maintenance of the Swan Pond facilities prior to the coal ash spill.

Plaintiffs also argue that the Tennessee Solid Waste Rules require that a facility perform "[p]roper operation and maintenance [which] includes effective performance, adequate operator staffing and training, and . . . adequate process controls, including appropriate quality assurance procedures." [Doc. 84-6, p. 3]. Thus, Plaintiffs allege that the 2003 blowout, the 2006 blowout, and the December 22, 2008 dike failure all constituted violations of the Tennessee Solid Waste Rules and TVA's permit for the Swan Pond facilities. Further, Plaintiffs allege that TVA violated its permit for the Swan Pond facilities because the permit required the minimization, to the extent practicable, of the potential for release of solid waste [*Id.*, p. 5].

The prohibition in the Tennessee Solid Waste Rules and TVA's permit on the release of hazardous substances is not the type of mandatory statute, regulation, or policy allowing no judgment or choice required by the first part of the *Gaubert* test. *See, e.g., Varig Airlines*, 467 U.S. 797. The *Gaubert* test does not look at the ultimate result of the challenged conduct, which may constitute a violation of relevant regulations or policies, but at whether there was a violation of a specific, mandatory policy in the conduct leading up to the violation. Moreover, a general directive or statement of purpose does not constitute a specific mandatory directive that requires a "precise manner" of performance. *See Rosebush*, 119 F.3d at 442-43 (finding that requirements to "'effectively administer, operate and maintain recreation sites and areas'" are directives that "vest complete discretion" in the governmental agency). Accordingly, the Court does not find that TVA has violated a specific mandatory directive under the Tennessee Waste Act or the Tennessee Solid Waste Rules and thus, in this regard, TVA has satisfied the first part of the *Gaubert* test.

### b. The Dam Safety Act and the Federal Guidelines for Dam Safety

Plaintiffs also allege that TVA violated the federal Dam Safety Act, 33 U.S.C. §§ 467, *et seq.*, and the Federal Guidelines for Dam Safety ("Dam Guidelines"), because TVA should have constructed its coal ash waste impoundment dikes in accordance with the Dam Safety Act and the Dam Guidelines. Plaintiffs also allege that TVA's construction, maintenance, and inspection of the coal ash impoundment dikes was deficient under the Dam Safety Act and the Dam Guidelines.

The Court finds that neither the Dam Safety Act nor the Dam Guidelines involve the type of specific, mandatory directives that dictate a specific course of conduct as required by the *Gaubert* test. Plaintiffs have not pointed to any specific policies or regulations that TVA violated under the Dam Safety Act in its use and maintenance of the Swan Pond facilities. Further, despite their title, the Dam Guidelines explicitly state that the guidelines are "not intended as guidelines or standards for the technology of dams" [Doc. 91-1, p. 282], and the Dam Guidelines explicitly recognize that "the degree of application will vary depending on the agency mission and function." [*Id.*].[33] Thus, in this regard, TVA has satisfied the first part of the *Gaubert* test.

> **c.** **The Federal Clean Water Act, the Tennessee Water Quality Control Act, the Federal Clean Air Act, and the Tennessee Air Quality Act**

Plaintiffs also allege that TVA violated the federal Clean Water Act, 33 U.S.C. § 1311(a) (the "CWA") and the Tennessee Water Quality Control Act, T.C.A. §§ 69-3-108(b), 69-3-114(b) (the "TWQCA"), because the coal ash flowed into the adjacent Emory and Clinch Rivers and the Watts Bar Reservoir. The CWA[34] and the TWQCA[35] both make it

---

[33] U.S. Dep't of Homeland Security, Federal Guidelines for Dam Safety, at 1 (reprint 2004) (1979) [*see* Doc. 91-1, p. 281].

[34] Making illegal "pollutant discharges except in compliance with law." 33 U.S.C. § 1311(a).

[35] Making unlawful the "alteration of the physical, chemical, radiological, biological, or bacteriological properties of any waters of the state; . . . [and t]he discharge of sewage, industrial wastes or other wastes into waters, or a location from which it is likely that the discharge substance will move into waters[.]" T.C.A. §§ 69-3-108(b)(1), (6).

unlawful to discharge pollutants, sewage, or industrial wastes into navigable waters.  33

U.S.C. § 1311(a); T.C.A. § 69-3-108(b)(1), (6).  Plaintiffs also allege that TVA violated the

federal Clean Air Act, 42 U.S.C. § 7418 (the "CAA"), and the Tennessee Air Quality Act,

Tenn. Comp. R. & Reg. § 1200-3-9-.01(1)(e) (the "TAQA").  The CAA requires compliance

with permitting standards for emissions into the air.  42 U.S.C. § 7661a.[36]  Plaintiffs argue

that because TVA's permit for the Swan Pond facilities contained limitations on emissions

and because TVA is bound to comply with the CAA, the coal ash spill on December 22, 2008

violated the limitations on emissions and therefore violated the CAA.  The TAQA requires

TVA to report certain fugitive emissions and Plaintiffs argue that TVA violated that

requirement because it did not report any fugitive emissions between November 18, 2008 and

February 10, 2009 [Doc. 84-2, pp. 47-49, 67-68, 70].

Similar to Plaintiffs' allegation that TVA violated the Tennessee Solid Waste Rules

because the result of the coal ash spill violated a prohibition in the Tennessee Solid Waste

Rules on the release of hazardous substances, Plaintiffs' allegations concerning the CWA,

the TWQCA, the CAA, and the TAQA also attack the result of TVA's challenged

conduct—the release of substances into surrounding waterways and the release of emissions

into the air following the coal ash spill.  Moreover, Plaintiffs have not alleged mandatory and

specific courses of action required by the these acts and violated by TVA in the course of its

conduct leading up to the coal ash spill.  Accordingly, the Court finds that TVA has satisfied

the first part of the *Gaubert* test in this regard.

---

[36] Making it unlawful "to violate any requirement of a permit."  42 U.S.C. § 7661a.

#### d.    TVA's Internal Policies and Procedures

Plaintiffs also allege that TVA violated "the first guiding principle" of the Tennessee Valley Authority 2008 Environmental Policy, a policy statement which provides that "TVA remains committed to complying with environmental laws and regulations with a goal of continuous improvement." [Doc. 84-12].  However, an agency's "commitment" to comply with environmental laws and regulations is not a specific, mandatory directive requiring a specific course of conduct.  As the Sixth Circuit recognized in *Rosebush*, general directives to comply with certain goals and priorities are not directives dictating the precise manner in which a particular act or course of conduct is to be implemented.  *Rosebush*, 119 F.3d at 442-43.  In *Rosebush*, the Sixth Circuit found that directives to the United States Forest Service to "[g]ive health and safety related items highest priority" and "[t]o the extent practicable, eliminate safety hazards from recreation sites" in conjunction with the development of operation and maintenance plans for recreation sites, vested complete discretion in the Forest Service and were not the type of specific, mandatory directives to which the discretionary function doctrine would apply.  *Id.*  Similarly, TVA's commitment to achieving compliance with environmental laws and regulations, a commitment which does not mandate a precise course of action, is not the type of specific directive contemplated by the first part of the *Gaubert* test.

Plaintiffs also allege that TVA violated internal procedures applicable to the engineering procedures at the Swan Pond facilities, specifically, the Civil Design Guide DG-C1.4.2., Slope Stability Analysis (the "Design Guide"), which pertains to ash pond and

dredge cell dikes.  The Design Guide specifically states that "[t]his design guide is to be considered in making static slope stability analyses" and that "[t]he following . . . will serve as a guide in selecting required (minimum) factors of safety." [Doc. 83-9, pp. 76, 86].  Given this language, the Court does not find that the Design Guide, which explicitly states that it is to be recognized as a "guide," identifying minimum factors of safety, constitutes the type of mandatory policy or procedure required by the *Gaubert* test.

Plaintiffs also allege that TVA violated the internal procedures outlined in the Engineering Procedure EN-DES-EP 1.09, Inspection and Maintenance of Ash Disposal Areas document (the "Engineering Procedures"), and the Kingston Fossil Plant Technical Instruction KIF.TI.08.00.010 Ash Management document (the "Ash Management Instructions").  Plaintiffs allege that these documents require TVA to perform certain inspections and that, even though the inspections were performed, the inspections "[f]ailed to insure that ash did not escape from the ash disposal areas." [Doc. 82, p. 53].

In *Myers v. United States*, the Sixth Circuit was confronted with a similar issue regarding inspections.  *Myers*, 17 F.3d 890, 895-97 (6th Cir. 1994).  In *Myers*, the plaintiffs claimed that mine inspectors violated mandatory, non-discretionary duties when the inspectors failed to determine that certain, dangerous conditions existed in the mines.  *Myers*, 17 F.3d at 895-97.  The mine inspectors had properly performed the inspections but, after performing the inspections, the inspectors determined that certain dangerous conditions did not exist.  *Id.*  If the inspectors had found certain dangerous conditions, corrective or protective orders would have been issued.  *Id.*  The Sixth Circuit stated that these inspections

presented the inspectors with a choice—whether a dangerous condition existed or whether it did not. *Id.* The *Myers* court found that the existence of such a choice following a required inspection was sufficient to satisfy the first part of the *Gaubert* test. *Id.*

Similarly, in these cases, in the inspections required by the Engineering Procedures and the Ash Management Instructions, the inspectors at the Swan Pond facilities were presented with a choice. Whether the inspectors made the wrong choice or were negligent in such choice is not the appropriate inquiry for the first part of the *Gaubert* test. Accordingly, because it seems to be undisputed that TVA did in fact perform these inspections, and the performance of the inspections was exactly what was required under these documents, the Court does not find that the failure of such inspections to determine a particular conclusion is the type of mandatory directive that would take TVA's conduct out of the discretionary function doctrine.

Finally, Plaintiffs allege that TVA violated the TVA RO [River Operations] Standard Department Procedure HYD-DG-C.1.4.2., Slope Stability Analysis General Design Information for TVA RO [River Operations] Facilities (the "RO"). TVA asserts that the Swan Pond facilities were under the jurisdiction of TVA's Fossil Power organization and were never under TVA's RO organization, and thus, this document does not apply to TVA's conduct as it relates to the Swan Pond facilities. However, even if the RO did apply to TVA's conduct in relationship to the Swan Pond facilities, the RO also contains the same type of "guideline" language regarding how TVA is to conduct slope stability analyses and

such language does not dictate specific mandatory policies or procedures.[37]  As such, the

Court's analysis and comparison of the mine inspections in the *Myers* case, analyzed above,

applies here as well.  Thus, the Court finds that TVA has satisfied the first part of the

*Gaubert* test in this regard as well.

### 2. Whether TVA's Use and Maintenance of the Swan Pond Facilities is Susceptible to Policy Analysis

Having determined that none of the federal laws, state laws, rules, regulations, or

internal policies and procedures cited by Plaintiffs contain specific, mandatory directives

dictating specific courses of action of the type required to take TVA's conduct out of the

discretionary function doctrine, the Court must now determine whether TVA has satisfied

the second part of the *Gaubert* test.  As stated in *Berkovitz*, "[t]he basis for the discretionary

function exception was Congress' [*sic*] desire to 'prevent judicial "second guessing" of

legislative and administrative decisions grounded in social, economic, and political policy

through the medium of an action in tort.'"  *Berkovitz*, 486 U.S. at 536-37 (quoting *Varig

Airlines*, 467 U.S. at 814).  "[T]he discretionary function exception insulates the Government

from liability if the action challenged in the case involves the permissible exercise of policy

judgment."  *Id.* at 537.  Thus, the appropriate inquiry is whether the conduct challenged by

Plaintiffs was grounded in considerations of public policy and involved the permissible

---

[37] "This design guide shall be used in making static slope stability analyses. . . . .  The responsible manager . . . will determine criteria to use in computations of dynamic and/or seismic slope stability analyses.  All of the slope stability methods described in this guide are considered acceptable when appropriately used. . . . . The methods will vary in complexity, accuracy, and applicability." [Doc. 83-9, p. 109].

exercise of policy judgment.  *See Gaubert*, 499 U.S. at 324-25; *Berkovitz*, 486 U.S. at 537; *Varig Airlines*, 467 U.S. at 814.

The appropriate analysis of the discretionary function doctrine is not whether a decision was made that *involved* policy considerations of a social, economic, or political type—as virtually every decision of a large federal agency and instrumentality such as TVA might.  Rather, the appropriate analysis is whether the particular decision or set of decisions giving rise to the conduct are *grounded* in such policy considerations.  *Gaubert*, 499 U.S. at 323 (emphasis added).  To this end, the Supreme Court has recognized that discretionary decisions are not limited to decisions involving policymaking or planning functions, but that "[d]ay-to-day management" type decisions, such as those that "regularly require[] judgment as to which of a range of permissible courses is the wisest[]" may also constitute discretionary decisions.  *Id.* at 324-25.  Further, it is the nature of the conduct in question that should be analyzed to determine whether it is of the type that Congress sought to protect, *Id.* at 322,[38] and whether such conduct can be said to be "based on the purposes that the regulatory regime seeks to accomplish."[39]  *Id.* at 325 n.7.

---

[38] "'[I]t is the nature of the conduct, rather than the status of the actor,' that governs whether the discretionary function exception applies."  *Gaubert*, 499 U.S. at 322 (quoting *Varig Airlines*, 467 U.S. at 813).

[39] "There are obviously discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish.  If one of the officials involved in this case drove an automobile on a mission connected with his official duties and negligently collided with another car, the exception would not apply.  Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy."  *Gaubert*, 499 U.S. at 325 n.7.

The Court's review of the complaints in this litigation indicate that Plaintiffs' tort claims pertain to TVA's conduct in the operation, use, and maintenance of the Swan Pond facilities. Plaintiffs have alleged that inspection reports regarding the Swan Pond facilities prior to the coal ash spill reported numerous defects and problems with the facilities [*see, e.g.,* Doc. 1, ¶ 122]. Plaintiffs have also alleged that TVA was negligent in that "[t]he containment structures . . . were not properly designed, constructed, or maintained" and that "[n]oticeable seepage and leaking" was "not . . . adequately repaired." [*Id.*, ¶¶ 123, 124]. Plaintiffs also allege that certain design and engineering aspects of the Swan Pond facilities were inadequate and contributed to the coal ash spill and that TVA "knew or should have known that there was a history of problems, warning signs, previous blows, leakages, erosions, instability, seepage, and overcapacity, among numerous other problems, with its ash waste handling and storage systems . . . ." [*Id.*, ¶ 127]. Plaintiffs allege that, despite knowledge of these problems, TVA failed to take reasonable and appropriate remedial action [*Id.*, ¶ 128].[40] Elaborating on these claims, Plaintiffs argue in their response to TVA's Motion to Dismiss or for Summary Judgment that TVA's coal ash handling and disposal policies and procedures, were, if not nonexistent, inadequate and ignored. Finally, Plaintiffs argue that TVA did not properly treat the coal ash as a "hazard" and that such neglect resulted in shortchanging safety recommendations and modifications and a failure to correct

---

[40] The Court has not inquired into whether TVA's conduct constitutes negligence, as such an inquiry is not within the scope of this Memorandum Opinion and Order.

problems with the structures and procedures necessary for coal ash disposal. Thus, in sum, the central issue for the Court to determine is whether the actions or inactions of TVA with respect to the operation, use, maintenance, design, and repair of the Swan Pond facilities and TVA's treatment and disposal of the coal ash, involve decisions grounded on considerations of public policy and the permissible exercise of policy judgment.

In opposition, TVA counters that any action or inaction it took in relation to the challenged conduct resulted from decisions susceptible to policy analysis. TVA maintains that the decisions relating to the challenged conduct involved balancing the relevant costs of alternatives and the consideration of policy factors, including: effectiveness, safety, social, political, economics, and costs. Decisions taking into consideration such factors, TVA argues, clearly fall within the discretionary function doctrine.

The Sixth Circuit has identified three categories of decisions protected from tort liability by the discretionary function doctrine. *Sharp v. United States*, 401 F.3d 440, 445 (6th Cir. 2005) (citing *Rosebush*, 119 F.3d at 443). The first category are decisions concerning the proper response to hazards. *Rosebush*, 119 F.3d at 443; *see Lockett v. United States*, 938 F.2d 630, 639 (6th Cir. 1991) (holding that the proper response to the discovery of PCBs in a residential area, including no response at all, was within the discretionary function doctrine); *see also Myslakowshi v. United States*, 806 F.2d 94, 97 (6th Cir. 1986). The second category consists of decisions regarding whether and how to make federal lands and facilities safe for visitors. *Rosebush*, 119 F.3d at 443; *see also Rich v. United States*, 119 F.3d 447, 451 (6th Cir. 1997) (holding that a decision to replace a guardrail on a bridge was

protected by the discretionary function doctrine).[41]   The third category encompasses

decisions of whether or not to warn of potential dangers.  *Rosebush*, 119 F.3d at 443 (holding

that the decision of whether to warn visitors of the danger of open fire pits was protected by

the discretionary function doctrine); *see also Edwards*, 255 F.3d at 345.[42]

Plaintiffs' allegations and claims of negligence in regard to TVA's conduct at the

Swan Pond facilities do not fall squarely within these three categories of decisions.

Plaintiffs' allegations are not analogous to the challenged conduct in *Lockett* because the

---

[41] In *Rich*, the court held that the decision by the Army Corps of Engineers to replace a guardrail on a bridge at a dam operated by the Corps was a decision reached after balancing the competing needs in running a federal facility and thus, met the second part of the *Gaubert* test.  *Rich*, 119 F.3d 447, 451 (6th Cir. 1997).  The *Rich* court stated that "the decision of how and when to replace a major element of a substantial public facility is . . . . inherently bound up in considerations of economic and political policy, and . . . is precisely the type of governmental decision that Congress intended to insulate from judicial second guessing through tort actions for damages."  *Id.* at 451 (citation and quotation omitted).

[42] In *Rosebush*, the court held that the decision of the United States Forest Service not to warn of the dangers associated with open fire pits was a decision susceptible to policy analysis and satisfied the second part of the *Gaubert* test because it involved balancing the needs of the campground users, the effectiveness of various types of warnings, aesthetic concerns, financial considerations, and the impact on the environment. *Rosebush*, 119 F.3d at 444.

In *Edwards*, the court held that TVA managers responsible for the Fort Loudoun Dam area, consisting of the dam and the surrounding land operated and maintained by TVA, must exercise policy judgments in making decisions about what specific measures to take for the safety of members of the public using the shoreline.  *Edwards*, 255 F.3d at 345.  Such judgment, the court held, involves the balancing of various considerations, "including the benefits of making Federal lands available for public recreation, public safety, the effectiveness of various types of warnings, aesthetic concerns, financial considerations, and environmental impact."  *Id.*

allegations do not focus on TVA's proper response to a known hazard.[43]  Plaintiffs' allegations also do not fall exclusively within the type of conduct challenged in *Rich*, as the allegations are not limited to allegations of negligence in failing to "replace," change, or modify the Swan Pond facilities.  Plaintiffs' allegations also do not fall exclusively within the category of conduct challenged in *Rosebush* or *Edwards*—conduct arising from decisions of whether to warn of existing dangerous conditions and whether to implement safety policies or measures on federal lands or in federal facilities to protect members of the public.  Rather, Plaintiffs' allegations focus on neglect, failure to correct structural and engineering problems with the Swan Pond facilities, failure to maintain, and a failure to have in place policies and procedures for dealing with coal ash waste.

The nature of the decisions giving rise to the various types of conduct challenged by Plaintiffs no doubt involved elements of choice and judgment.  However, the Court cannot determine, as a matter of law, whether the choices and judgments inherent in all these relevant decisions were grounded in considerations of public policy.  The discretionary function doctrine has been broadly construed by the Supreme Court, the Sixth Circuit, and other courts.  However, the doctrine has not been construed so as to swallow the rule.  TVA's position is overbroad in that, if the Court were to adopt it, virtually all actions taken by TVA in regard to the operation, use, or maintenance of any TVA facility would implicate decisions

---

[43] Rather, Plaintiffs' position seems to be that the coal ash disposal area, prior to the spill, was not regarded as a potential hazard at all.  The decisions by TVA that might seem to fall within this category of decisions regarding an agency's proper response to a possible hazard would include decisions made by TVA following the coal ash spill.  *See infra* part IV, section E.

based on the type of public policy considerations protected by the discretionary function doctrine.  When the conduct of an agency, such as TVA, is challenged, and the challenged conduct—to the extent it even arises from an identifiable decision—involves neglect, negligence in the day-to-day maintenance and operation of facilities, or an agency's adherence to safety and engineering recommendations, the discretionary function doctrine cannot be as broad and absolute as TVA argues.

As such, the conduct challenged in these cases is not governed solely by the line of cases analyzing the type of conduct and decisions that were considered in *Rosebush*, *Rich*, and *Edwards*—decisions involving a government agency's proper response to a hazard, how to keep federal properties safe for visitors, and an agency's failure to warn of dangerous conditions.  Instead, several of Plaintiffs' tort claims fall within the category of cases which address the actual implementation of a particular policy decision that is itself protected by the discretionary function doctrine.  That is, once a government agency makes a policy decision protected by the discretionary function doctrine, the agency must then proceed with care in the implementation of that decision.  *See Indian Towing Co. v. United States*, 350 U.S. 61 (1955); *Reminga v. United States*, 631 F.2d 449 (6th Cir. 1980); *Caplan v. United States*, 877 F.2d 1314 (6th Cir. 1989).[44]

The implementation of such policy decisions constitutes part of the conduct challenged by Plaintiffs in these cases.  In the years prior to the coal ash spill, TVA made a

---

[44] Discussed *infra*.

policy decision, grounded in considerations of public policy, to have a wet coal ash storage and disposal facility. In conjunction with this overarching policy decision, TVA made a series of policy decisions regarding where to locate the coal ash disposal facilities and the design and construction of the facilities. TVA also made policy decisions after the Swan Pond facilities were in operation as to what policies and procedures would govern the coal ash disposal, decisions such as whether to implement modifications or changes to the facilities and whether to continue disposing of the coal ash with a wet storage system. Several of Plaintiffs' tort claims, however, challenge conduct apart from these policy decisions.

In analyzing the conduct challenged in these cases, the Court has examined the scope of the discretionary function doctrine as illustrated in *Indian Towing*.[45] The Supreme Court characterized the scope of the discretionary function doctrine in *Indian Towing* as follows:

> The plaintiff in that case sued the Government for failing to maintain a lighthouse in good working order. The Court stated that the initial decision to undertake and maintain lighthouse service was a discretionary judgment . . . . The Court held, however, that the failure to maintain the lighthouse in good condition subjected the Government to suit under the FTCA . . . . The latter course of conduct did not involve any permissible exercise of policy judgment.

*Berkovitz*, 486 U.S. at 538 n.3 (discussing *Indian Towing*, 350 U.S. 61). As the Supreme Court in *Indian Towing* noted:

---

[45] The discretionary function doctrine was not at issue in *Indian Towing*; nonetheless, it has been used in the analysis of discretionary function doctrine cases by the Supreme Court. *See, e.g.,* *Berkovitz*, 486 U.S. at 538 n.3.

> [T]he Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light house . . . and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in working order . . . and to repair the light or give warning that it was not functioning. If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the [Federal] Tort Claims Act.

*Indian Towing Co.*, 350 U.S. at 69.

Similar to the decisions and conduct in *Indian Towing*, once TVA exercised its discretion to construct, use, and keep in operation the Swan Pond facilities, it was obligated to operate the facilities in a non-negligent manner. Plaintiffs in these cases have alleged that TVA was negligent in maintaining the Swan Pond facilities, negligent in failing to correct problems with the Swan Pond facilities, and negligent or neglectful in how TVA followed its own policies and procedures governing coal ash disposal [*see* Doc. 1, ¶¶ 122-28]. TVA has argued that changes and modifications were made to the Swan Pond facilities in accordance with engineering and safety recommendations and that it considered and evaluated improvements and changes to the facilities in the years leading up to the coal ash spill. These corrective and remedial actions may constitute decisions grounded in policy considerations—however, the Court cannot find that such decisions, as a matter of law, encompass Plaintiffs' claims that TVA neglected the facilities, neglected maintenance and upkeep, neglected to implement policies and procedures, and was negligent in the maintenance of the facilities. Such conduct cannot be said to be based on coal ash disposal and power production, the purposes of the Swan Pond facilities. *See Gaubert*, 499 U.S. at

325 n.7.[46]  Further, the Court cannot say, as a matter of law, that neglect of a facility—for instance, the neglect of a retaining wall or a dike—arose from a decision which required a judgment that considered a range of permissible courses of action.  *Id.* at 325.

In *Reminga v. United States*, the Sixth Circuit held that the discretionary function doctrine did not apply to the government's negligent preparation of a navigational chart because, as described in a later case:

> [O]nce having exercised the discretion to issue navigational charts, the government is accountable for its negligence in failing to locate hazard accurately on the charts it publishes.  Erroneously locating navigational hazards on its charts, like running a red light with a motor vehicle and causing an accident, involves no discretionary function or duty.  Having undertaken, in its discretion, to issue charts locating navigational hazards at all, the FAA was liable for doing so carelessly.

*Myslakowski*, 806 F.2d at 98 (discussing *Reminga v. United States*, 631 F.2d 449 (6th Cir. 1980)).  In these cases, TVA's decisions to construct and continue to use the Swan Pond facilities would be protected by the discretionary function doctrine as decisions grounded on the permissible exercise of policy judgment and public policy considerations.  TVA's policies and procedures governing coal ash disposal would also constitute decisions grounded on public policy considerations.  However, similar to the *Reminga* court's discussion of the navigational charts, once TVA developed and implemented such policies and procedures, once it engaged in the analysis as to what type of policies and procedures

---

[46] "There are obviously discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish." *Gaubert*, 499 U.S. at 325 n.7.

to implement, it would not constitute a discretionary decision to decide whether to follow or act pursuant to those policies and procedures. Neglect, ignoring policies and procedures, failing to implement corrective measures or modifications under those policies, or the failure to have in place any policies and procedures governing coal ash disposal, are not the type of decisions or conduct protected by the discretionary function doctrine.

In *Caplan v. United States*, the Sixth Circuit arrived at a similar conclusion, holding that once a relevant policy decision has been made, "the government is accountable for its negligence in the implementation of [that] decision. *Caplan*, 877 F.2d 1314, 1316 (6th Cir. 1989). In *Caplan*, the Sixth Circuit held that "the government's decision to deforest parts of the Daniel Boone National Forest in preparation for reforestation" by treating designated trees with an herbicide treatment, was the relevant policy decision to which the discretionary function doctrine would apply, not the government's decision not to warn about dangerous conditions in particular areas of the forest created as a result of the large number of unstable trees. *Id.* at 1315-17. In *Caplan*, the plaintiff, a contractor hired to cut down live trees, was injured when a nearby dead tree fell and struck him as he was cutting down one of the live trees in the forest. *Id.* The government's previous herbicide treatment had caused the root system of the dead tree to decay to such an extent that the tree was barely anchored to the ground and the resulting ground shock from the falling live tree caused the dead tree to fall. *Id.* Here, the Sixth Circuit stated, the decision to deforest did not require, either directly or implicitly, the giving or the omission of warnings. *Id.* Thus, it was not a matter of discretion on the part of the government whether or not to warn the contractor or others. *Id.* Rather,

once the government determined a policy—the policy of deforestation—the government was accountable for negligence in implementing that policy. *Id.* at 1316.

In these cases, once TVA determined and implemented the policy decision to have a coal ash storage facility at Swan Pond, TVA had an obligation to continue and pursue that policy decision in a non-negligent manner. Following or acting pursuant to such policies and procedures was not a matter of discretion—the issues raised by Plaintiffs' claims in these cases are not solely questions of social wisdom, but also of negligence, not questions of political or economic practicability, but of due care. To this end, the Court recognizes that several of Plaintiffs' claims encompass allegations that TVA should have converted the Swan Pond facility to a dry coal ash disposal system, that TVA should have constructed the Swan Pond facilities in a different manner, or that the policies and procedures TVA had in place were improper. If these claims were Plaintiffs' sole claims against TVA, then the discretionary function might very well shield TVA from all liability.

However, Plaintiffs' allegations challenge conduct apart from these policy decisions. Neglect of the facilities [Doc. 1, ¶¶ 122, 127-28], neglect of day-to-day maintenance [*Id.*, ¶¶ 122-24], ignoring policies and procedures, failing to implement corrective measures or modifications under those polices or procedures [*Id.*], and the failure to have in place policies and procedures [*Id.*, ¶¶ 125-26], are not discretionary decisions involving the permissible exercise of policy judgment and consideration of public policy. Thus, the Court concludes that this type of conduct by TVA is not shielded by the discretionary function doctrine.

## E.    TVA's Coal Ash Spill Removal and Remediation Conduct

TVA also asserts that its response, removal, and remediation activities following the December 22, 2008 coal ash spill satisfy steps one and two of the *Gaubert* test and the discretionary function doctrine precludes Plaintiffs' tort claims for any injuries or damages allegedly caused by these activities.  TVA first argues that Plaintiffs' complaints do not allege that TVA's post-spill conduct violated any mandatory specific recovery and remediation directives pertinent to the tort claims underlying Plaintiffs' allegations.  Second, TVA argues that its post-spill conduct is being conducted pursuant to CERCLA and the NCP subpart involving hazardous substance response.  *See* 40 C.F.R. § 300.400(h)(i)(3).  The NCP subpart provides that "[a]ctivities by the federal and state governments in implementing this subpart are discretionary governmental functions."  *Id.*; *see, e.g., Lockett*, 938 F.2d at 639 (holding that the EPA's determination of the proper response to the discovery of PCB's at a scrap yard site fell within the discretionary function doctrine).  The EPA also delegated federal lead agency authority to TVA for response, removal, and remediation activities relating to the coal ash spill [Doc. 44-2, pp. 77-78].[47]  While the EPA has stated that it "considers the Kingston spill to be an unpermitted discharge of a pollutant in contravention of the Clean Water Act," the EPA and TDEC directed TVA to work with the agencies to "identify applicable cleanup standards and other standards of control and . . . resolve any discrepancies that might exist between federal and state requirements."  [*Id.*].

---

[47] *See supra* text pp. 10-12 and accompanying notes (discussing TVA's response and remedial activities and its authority under CERCLA).

The Court agrees that the discretionary function applies to TVA's conduct following the coal ash spill. As to the first step of the *Gaubert* test, the Court has found no allegation by Plaintiffs that TVA failed to follow specific, mandatory directives in its activities following the coal ash spill. As to the second step of the *Gaubert* test, such activities are explicitly recognized as being "discretionary" under the NCP. 40 C.F.R. § 300.400(h)(i)(3) (providing that "[a]ctivities by the federal and state governments in implementing this subpart are discretionary governmental functions"). Further, the Court notes that such activities involve considerations of where and how to remove the coal ash, the specific clean-up methods to be used at certain properties, and the interactions and communications of TVA, the EPA, and TDEC with one another and the surrounding communities regarding removal, remediation, and relief efforts. TVA's response and remediation activities may also involve decisions and conduct in response to a hazard, a category of decisions that the Sixth Circuit has held to fall within the discretionary function doctrine. *Rosebush*, 119 F.3d at 443; *see also Lockett*, 938 F.2d at 639. The waste from the coal ash spill, while it has not been designated a hazardous substance, is known to contain certain toxins and thus, TVA's decisions regarding its activities subsequent to the spill may constitute activities in response to the release of hazardous substances. If so, such decisions may constitute permissible policy judgments in response to a hazard for purposes of the discretionary function doctrine. *Rosebush*, 119 F.3d at 443; *Lockett*, 938 F.2d at 639.

**F.      Waivers of Sovereign Immunity in the Clean Water Act and the Resource Conservation and Recovery Act**

Plaintiffs also allege that the federal Clean Water Act (the "CWA"), 33 U.S.C. § 1323, and the Resource Conservation and Recovery Act (the "RCRA"), 42 U.S.C. § 6961, contain unequivocal and complete waivers of sovereign immunity which authorize Plaintiffs' tort claims against TVA. The CWA provides that:

> Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government . . . shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity[.]

33 U.S.C. § 1323(a). The RCRA contains a similar provision, except with respect to federal, state, and local requirements "respecting control and abatement of solid waste or hazardous waste disposal and management." 42 U.S.C. § 6961(a). Plaintiffs argue that the term "requirements" in these statutes encompass state common law actions such as a nuisance actions, and therefore the CWA and the RCRA waive TVA's immunity for suits to enforce state requirements through common law tort suits. *See, e.g., North Carolina v. TVA*, 515 F.3d at 351.[48]

---

[48] The state of North Carolina brought a common law nuisance action against TVA, seeking to address emissions of air pollution from TVA's coal-fired electric generating units installed in electric generators stations in several states. *North Carolina v. TVA*, 515 F.3d at 347-48. The Fourth Circuit held that the meaning of the term "requirements" in the waiver provision could mandate compliance with state "requirements" enforced through a common law tort suit. *Id.* at 352-53.

TVA asserts that the CWA and the RCRA do not constitute complete waivers of sovereign immunity for purposes of private suits for damages. Rather, TVA asserts that the waivers in these statutes should be strictly construed and only waive immunity for the public purposes of enforcing the requirements of the statutes, not the "requirements" of state common law, enforced through tort actions. Further, TVA argues that the discretionary function doctrine would be applicable to any tort claims Plaintiffs assert under the CWA and the RCRA, and thus, TVA would still be shielded from liability.

As stated above in the Court's analysis of Plaintiffs' tort claims under the first part of the *Gaubert* test,[49] Plaintiffs have not alleged a violation of any specific, mandatory directive in the CWA in respect to TVA's use and maintenance of the Swan Pond facilities. Plaintiffs have also not alleged a violation of any specific, mandatory directive in the RCRA in respect to TVA's use and maintenance of the Swan Pond facilities. Accordingly, the Court need not decide at present whether the CWA and the RCRA waive sovereign immunity for TVA in respect to Plaintiffs' common law tort allegations. Such an analysis would require a determination regarding the reach and extent of the waiver of immunity under the CWA and the RCRA, and a determination of whether Plaintiffs' claims constitute claims brought for the public purposes of enforcing the "requirements" of the CWA and the RCRA. The Court would also have to consider whether Plaintiffs' claims under the Tennessee common law define torts that impose "requirements" pertaining to "the control and abatement of water

---

[49] *See supra* part V, section D, subpart 3.

pollution," as required by the CWA, and "requirements" pertaining to the "control and abatement of solid waste or hazardous waste disposal and management," as required by the RCRA. 33 U.S.C. § 1323(a); 42 U.S.C. § 6961(a). Such an analysis and determination is not necessary for the Court's present Memorandum Opinion and Order.

## VI. ANALYSIS OF *BLANCHARD*, *RAYMOND*, AND *SCOFIELD*'S CLAIMS FOR INVERSE CONDEMNATION

### A. Standard of Review

A party may move to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure Rule 12(b)(6). In determining whether to grant a motion to dismiss, all well-pleaded allegations must be taken as true and must be construed most favorably toward the non-movant. *Trzebuckowski v. City of Cleveland*, 319 F.3d 853, 855 (6th Cir. 2003). While a court may not grant a Rule 12(b)(6) motion based on disbelief of a complaint's factual allegations, *Lawler v. Marshall*, 898 F.2d 1196, 1199 (6th Cir. 1990), the court "need not accept as true legal conclusions or unwarranted factual inferences." *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987). While a complaint need not contain detailed factual allegations, the plaintiff must provide the grounds for his or her entitlement to relief, and this "requires more than labels and conclusions, and a formulaic recitation fo the elements of a case of action." *Twombly*, 550 U.S. at 555 (abrogating *Conley v. Gibson*, 355 U.S. 41 (1957)); *see also Iqbal*, 129 S. Ct. 1937(reaffirming that the *Twombly* standard for determining the sufficiency of a pleading applies to civil actions and is not limited to anti-trust claims); *MacDermid v. Discover Fin. Servs*, 488 F.3d 721, 733 (6th Cir. 2007). Thus,

the factual allegations supplied in "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570); *see also Courie v. Alcoa Wheel & Forged Products*, 577 F.3d 625, 629-30 (6th Cir. 2009) (stating that the standard for a motion to dismiss is to screen out cases that "while not utterly impossible, are 'implausible'").

### B.     Claims for Inverse Condemnation

#### 1.      Pleading Requirements

TVA argues that the inverse condemnation claims of the *Blanchard* plaintiffs, the *Raymond* plaintiffs, and the *Scofield* plaintiffs should be dismissed as a matter of law because the claims fail to make the necessary allegations for inverse condemnation claims. Following the filing of TVA's Motion to Dismiss or Motion for Summary Judgment, the *Blanchard* plaintiffs, the *Raymond* plaintiffs, and the *Scofield* plaintiffs amended their complaints [*Blanchard* Amended Complaint, Doc. 61; *Raymond* Amended Complaint, Doc . 53; *Scofield* Amended Complaint, Doc. 22]. However, TVA asserts that the amended complaints still fail to plead the inverse condemnation claims because the allegations "are silent about facts sufficient to provide reasonable notice of the identity of each specific tract allegedly condemned by the [coal ash spill] and [fail] to describe the specific property interest allegedly taken in each tract allegedly condemned." [Doc. 91, p. 54].

In the amended complaints, Plaintiffs[50] have alleged ownership of certain properties and supplied addresses of the Plaintiffs whose properties are the subjects of the inverse condemnation claims. TVA first asserts that these claims should be dismissed because Plaintiffs have not pled the specific property interests allegedly taken and have not stated what particular parts of the property tracts were allegedly taken.

TVA urges the Court to compare the inverse condemnation claims in this case with the inverse condemnation claim in *Irick v. Columbia Gas Transmission Corp.*, Civil Action No. 5:07cv00095, 2008 WL 191324 (W.D. Va. Jan 22, 2008). In *Irick*, Columbia Gas had condemned and begun construction of a gas pipeline easement under the Irick's property. *Irick*, 2008 WL 191324, at *1. The Iricks filed an inverse condemnation claim and Columbia Gas moved to dismiss, arguing that the complaint was too "vague and conclusory, so as not to permit a determination of what property the Iricks claim Columbia has taken[.]" *Id.* at *1. The court agreed with Columbia Gas, requiring the Iricks to amend their complaint to include a reasonably precise description of the segment of the property allegedly taken. *Id.* at *2.

The inverse condemnation claim in *Irick* concerned a pipeline underneath the subject property, property over which Columbia Gas had already acquired a gas pipeline easement. Columbia Gas was therefore lawfully on portions of the Irick's property and needed more specific notice as to which portions of the property the Irick's were claiming was allegedly

---

[50] For ease of reference, the Court will continue to refer to the plaintiffs who have asserted inverse condemnation claims as "Plaintiffs." The reader should keep in mind, for this section only, that "Plaintiffs" only refers to the *Blanchard* plaintiffs, the *Raymond* plaintiffs, and the *Scofield* plaintiffs.

"taken" unlawfully. The inverse condemnation claims before this Court concern a spill of coal ash material over properties in which TVA claims no property interest. Here, a more precise description and formulation of Plaintiffs' properties is not necessary because there is no need to distinguish between what TVA had lawfully "taken" and what they had not. Thus, if Plaintiffs allegations are taken as true, as the Court is required to do for a motion to dismiss, and the coal ash material has been discharged onto Plaintiffs' properties and such discharge constitutes a taking, the determination of exactly what properties and what property interests are alleged to have been "taken" are allegations capable of being answered in an appropriate responsive pleading and clarified and narrowed with appropriate investigation and discovery requests. Thus, Plaintiffs' claims, accepted as true, are sufficient to state a claim for relief that is plausible on its face. *Iqbal*, 129 S. Ct. 1337; *Twombly*, 550 U.S. 544 (2007).

### 2. The Necessary Elements for Inverse Condemnation Claims

TVA also argues that even if the allegations in the amended complaints satisfy the pleading requirements, Plaintiffs have not alleged facts sufficient to satisfy the necessary elements for claims of inverse condemnation. *See Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355-56 (Fed. Cir. 2003). Plaintiffs assert that the allegations in their complaints "at least meet the plausibility standard" required for a motion to dismiss.

The Fifth Amendment to the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. This power of eminent domain has been delegated by Congress to TVA. 16 U.S.C. §§

831c(h), 831c(i), 831x.  When there is no formal exercise of eminent domain, a "taking" allegation is a claim for inverse condemnation.  *Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009).

Inverse condemnation is "a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted."  *United States v. Clarke*, 445 U.S. 253, 257 (1980).  A claim for inverse condemnation involves a two-part test that can be characterized as a causation prong and an appropriation prong.  *See, e.g., Cary*, 552 F.3d at 1376; *Ridge Line*, 346 F.3d 1346.  As to the causation prong, a property loss compensable as a taking only results when the government intends to invade a protected property interest or the asserted invasion is the "direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action."  *Ridge Line, Inc.*, 346 F.3d at 1355-56 (citation and quotations omitted).  As to the appropriation prong, "[e]ven where the effects of the government action are predictable, to constitute a taking, an invasion must appropriate a benefit to the government at the expense of the property owner, or at least preempt the owner's right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value.  *Id.* at 1356.  Under the appropriation prong, the nature and magnitude of the government action must be considered.  *Id.* at 1355-56.

As to the causation prong, Plaintiffs allege that TVA's "discharge of coal ash sludge and contaminated water" was "the direct, natural, or probable result of TVA's construction, operation and maintenance" of the Swan Pond facilities.  Thus, the Court must find that

Plaintiffs have alleged, in their complaints, facts by which it is plausible that the coal ash spill was a "direct, natural, or probable" result of TVA's conduct and that "the injury . . . [was] the likely result of the act." *Cary*, 552 F.3d at 1377. "Taking a calculated risk, or even increasing a risk of a detrimental result, does not equate to making the detrimental result direct, natural, or probable." *Id.* at 1378.

Plaintiffs have alleged that TVA was aware that the containment dike at the Swan Pond facilities was likely to fail, that the facilities had previously experienced seepage problems, and that TVA failed to take reasonable and appropriate action to remedy leaks and other problems that would have prevented the dike failure of December 22, 2008 [*see, e.g., Blanchard* Amended Complaint, Doc. 61, ¶¶ 11-20]. Taken as true, such allegations do not constitute "implausible" allegations that the coal ash spill was a direct, natural, or probable result of TVA's conduct. *See, e.g., Cotton Land Co. v. United States*, 75 F. Supp. 232, 232-35 (1948) (holding that a taking was found where construction and operation of a dam initiated a series of events that led to a flooding of the plaintiff's property). Moreover, at this stage of the litigation and on the pleadings alone, the Court cannot determine whether or not the coal ash spill was merely an incidental or consequential result of TVA's use and maintenance of the Swan Pond facilities.

As to the appropriation prong, Plaintiffs allege that TVA received a benefit by disposing of "coal ash and toxic chemicals" onto Plaintiffs' properties at the expense of Plaintiffs' use and enjoyment of their property. Further, Plaintiffs allege that the coal ash and

toxic chemicals will remain on their properties indefinitely and that the interference with Plaintiffs' use and enjoyment of their properties will continue for the foreseeable future.

TVA argues that the facts of this case are similar to those of *Cary v. United States*, in which the Federal Circuit Court of Appeals held that damage to the plaintiffs' properties from a fire which began in a national forest and spread to the plaintiffs' properties—a one time occurrence— was not sufficiently permanent so "that it can be said that the government has exercised dominion over the property" for the purposes of the appropriation prong. *Cary*, 552 F.3d at 1381. However, in these cases, Plaintiffs argue that the facts of the coal ash spill are most similar to the cases in which property was held to be appropriated by the government following a flooding. *See United States v. Dickinson*, 331 U.S. 745, 748 (1947) (holding that flooding of property resulted in a taking); *Ridge Line, Inc.*, 346 F.3d 1346 (holding that flooding of property through increased storm water flow can result in taking, even if not permanent).

In *Ridge Line, Inc.*, the court noted "that intermittent flooding of private land can constitute a taking of an easement . . .[and a] permanent destruction or exclusive occupation . . . is not always required for a successful takings claim. *Ridge Line, Inc.*, 346 F.3d at 1354. Thus, the *Ridge Line, Inc.* court concluded, "increased water runoff" may constitute the taking of a "flowage easement by inverse condemnation," *Id.* at 1355, and it "must then [be]

considered whether the government appropriated from [the plaintiff] a legally protectable easement interest." *Id.* at 1357. Similarly, the *Cary* court observed that

> In the flooding cases, appropriation means that the water stays on the property indefinitely, or predictably returns—a permanent invasion. Here, the fire has come and gone, and there is no allegation that the injuries prevent future use of the land, or that the fire will intermittently but inevitably recur.

*Cary*, 552 F.3d at 1381.

In these cases, Plaintiffs have alleged that the coal ash invaded their properties and that the toxic chemicals from the coal ash will remain on their properties indefinitely. This invasion was not permanent or exclusive in the manner of a permanent flooding, however, such permanence or exclusivity is not required to prevail on a claim for inverse condemnation. *See Ridge Line, Inc.*, 346 F.3d at 1354. Further, while the coal ash itself has not remained on the property, Plaintiffs have asserted that the toxic chemicals from the coal ash remain and that such chemicals will remain and interfere with Plaintiffs' use and enjoyment of their properties for the foreseeable future. This, if true, may constitute a permanent invasion of a legally protectable interest—namely, Plaintiffs' interest in receiving a beneficial use of their properties. Such allegations are not, as TVA argues, "[t]hreadbare recitals of the elements of a cause of action," but are allegations of facts that may support a plausible claim to relief. *Iqbal*, 129 S. Ct. at 1949-50.

Thus, upon review of the factual allegations asserted by Plaintiffs and the facts and circumstances of this case, the Court concludes that Plaintiffs have reasonably identified the tracts and property interests allegedly condemned for purposes of a motion to dismiss for

failure to state a claim.  The Court also finds that Plaintiffs have pled sufficient facts relative to the necessary elements for inverse condemnation claims—alleged facts that if true, may constitute an invasion that was a "direct, natural, or probable result" of conduct by TVA and an invasion that at least preempted Plaintiffs' right to the beneficial use of the properties or the right to enjoy it for a period of time.

## VII.  TVA'S MOTION TO DISMISS PUNITIVE DAMAGES AND STRIKE JURY DEMAND

In TVA's Motion to Dismiss Punitive Damages and Strike Jury Demand [Doc. 58], TVA moves the Court to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6),[51] the claims for punitive damages, arguing that, as a matter of law, punitive damages may not be recovered against TVA.  TVA argues that as a federal agency and instrumentality, it is not subject to liability for punitive damages because Congress has not expressly authorized such damages and because historical and policy considerations mandate that punitive damages may not be imposed upon governmental agencies and instrumentalities such as TVA.  TVA also requests that the Court strike, pursuant to Federal Rule of Civil Procedure 12(f),[52] the

---

[51] *See supra* part V, section A for the standard of review for a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

[52] Federal Rule of Civil Procedure 12(f) authorizes the Court to strike from any pleading any claim that is redundant, immaterial, impertinent, or scandalous.  *See* Fed. R. Civ. P. 12(f); *see also* Fed. R. Civ. P. 38(a) ("Right Preserved.  The right of trial by jury as declared by the Seventh Amendment to the Constitution – or as provided by a federal statute – is preserved to the parties inviolate."); Fed. R. Civ. P. 38(b) ("Demand.  On any issue triable of right by a jury, a party may demand a jury trial . . . .").

demands for a jury trial because there is no such right against TVA as the TVA Act does not expressly grant a plaintiff the right to a trial by jury in a tort action against TVA.

In response, Plaintiffs argue that TVA, a "sue and be sued" entity, is subject to suit in exactly the same manner as any private entity under like circumstances, including awards of punitive damages and a trial by jury. As such, Plaintiffs argue that by virtue of the "sue and be sued" clause in the TVA Act, Congress waived TVA's claim to sovereign immunity and the Court should not "lightly" imply restrictions on such a statutory waiver. Further, Plaintiffs assert that TVA has not shown that any restrictions on this waiver are warranted and assert that TVA has erroneously conflated the sovereign immunity of the federal government with the immunity of federal instrumentalities and federally-created corporations launched into the commercial world.

## A.    Punitive Damages Analysis

The United States and its instrumentalities are immune from suit except to the extent that such immunity has been waived. *See, e.g., Loeffler*, 486 U.S. at 554. The Supreme Court has held, that in light of the doctrine of sovereign immunity, courts lack the authority "to impose punitive fines or assessments upon an instrumentality of the United States, absent an express waiver of such immunity by Congress. *Commerce Fed. Sav. Bank v. Fed. Deposit Ins. Corp.*, 872 F.2d 1240, 1248 (6th Cir. 1989) (quoting *Mo. Pac. R.R. v. Ault ("Ault")*, 256 U.S. 554, 563-65 (1921); *accord Norfolk-Southern R.R. Co. v. Owens*, 256 U.S. 565, 565 (1921).

As stated previously in this Order, TVA is a federal agency and an instrumentality of the United States. 16 U.S.C. § 831r; *see also Matheny*, 557 F.3d at 320 ("TVA is a 'wholly-owned corporate agency and instrumentality of the United States'") (quoting *Edwards*, 255 F.3d at 322-23)). TVA's waiver of immunity arises by virtue of the "sue and be sued" clause in the TVA Act. 16 U.S.C. § 831c(b). Courts have interpreted this waiver as "making the TVA liable to suit in tort, subject to certain exceptions." *Smith*, 499 U.S. at 168-69.[53] The Supreme Court has described such "sue and be sued" clauses as follows:

> [S]uch waivers by Congress of governmental immunity . . . should be liberally construed . . . . Rather if the general authority to 'sue and be sued' is to be delimited by implied exceptions, it must be clearly shown that certain types of suits are not consistent with the statutory or constitutional scheme, that an implied restriction of the general authority is necessary to avoid grave interference with the performance of a governmental function, or that for other reasons it was plainly the purpose of Congress to use the 'sue and be sued' clause in a narrow sense. In the absence of such showing, it must be presumed that when Congress launched a governmental agency into the commercial world and endowed it with authority to 'sue and be sued,' that agency is not less amendable to judicial process than a private enterprise under like circumstances would be.

*Burr*, 309 U.S. 242, 245 (1940) (footnote omitted); *Meyer*, 510 U.S. at 480-81 (quoting *Burr*).

---

[53] Similarly, "[t]he sue-and-be sued clause [in the Postal Reorganization Act] waives immunity, and makes the Postal Service amendable to suit, as well as to the incidents of judicial process. While Congress waived the immunity of the Postal Service, Congress did not strip it of its governmental status. The distinction is important." *United States Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 744 (2004) (internal citations omitted).

Plaintiffs state that entities whose immunity is waived under such "sue and be sued" clauses are presumed to carry the liability of a private enterprise, such as liability for punitive damages and susceptibility to a plaintiff's right to a trial by jury, subject to limited exceptions made available only if "stringent prerequisites" are met. *Meyer*, 510 U.S. at 480. Plaintiffs argue that such "stringent prerequisites" require the party seeking immunity to make a "clear showing" that certain types of suits are not consistent with the statutory or constitutional framework, that an implied restriction of the general authority is necessary to avoid grave interference with the performance of a governmental function, or that for other reasons it was plainly the purpose of Congress to use the "sue and be sued" clause in a narrow sense. *See id.* (quoting *Burr*, 309 U.S. at 245). Plaintiffs argue that TVA has failed to make a "clear showing" satisfying one of these prerequisites and that, absent such a showing, TVA is subject to the natural incidents and processes of civil litigation that would be available against a private company under similar circumstances—including punitive damages and a right to a jury trial.

Plaintiffs argue that TVA has ignored the Supreme Court's analysis of the extent of a "sue and be sued" entity's waiver of immunity as it was articulated in *Loeffler* and again in *Meyer*. However, this Court does not read *Loeffler* and *Meyer* to demand a different analysis than that which has previously been applied by the Supreme Court and the Sixth Circuit. In *Commerce Fed. Sav. Bank*, the Sixth Circuit found that absent a specific express authorization by Congress, sue and be sued entities are not subject to punitive damages. *See*

*Commerce Fed. Sav. Bank*, 872 F.2d 1240, 1248 (6th Cir. 1989).[54]  In its analysis, the Sixth

Circuit specifically cited to *Loeffler*, the Supreme Court case which contains the "clear

showing" language focused on by Plaintiffs, language that was first articulated by the

Supreme Court in *Burr*.  *Id.* (citing *Loeffler*, 486 U.S. at 554-55).  The *Meyer* case does not

alter the *Loeffler* analysis.  Rather, the same language from *Loeffler*, the "clear showing"

language first articulated in *Burr*, remains the focus of the inquiry.  As such, this "clear

showing" language is not a different test, but part and parcel of the *Burr* and *Loeffler* analysis

in determining the scope of the waiver in the context of "sue and be sued" clauses of federal

agencies and instrumentalities.  Using this analysis, the Sixth Circuit and other circuit courts

have held that "sue and be sued" entities are not subject to punitive damages unless Congress

has expressly authorized such penalties.  The Court finds no reason to alter that

determination.

 The Sixth Circuit has previously affirmed holdings of this district court that TVA's

conduct in furtherance of its authority under the TVA Act, "[t]o produce, distribute, and sell

electric power," constitutes conduct in which TVA is acting as a governmental agency.  16

U.S.C. § 831d(l); *see, e.g., Edwards*, 255 F.3d at 324-25; *Queen*, 689 F.2d at 81-83.  The

situation presented in these cases, Plaintiffs' tort claims arising out of TVA's conduct in

---

[54] *Commerce Fed. Sav. Bank* involved a claim for an award of punitive damages against the Federal Deposit Insurance Corporation (the "FDIC").  *Commerce Fed. Sav. Bank*, 872 F.2d at 1241-42.  In that case, the Sixth Circuit noted that, "in light of the doctrine of sovereign immunity, the courts lack[] the authority to impose punitive fines or assessments upon an instrumentality of the United States, absent an express waiver of such immunity by Congress."  *Id.* at 1248.  Finding no such congressional waiver, the Sixth Circuit found that the plaintiff could not recover punitive damages against the FDIC.  *Id.*

furtherance of its power production activities, also constitutes conduct that the TVA Act explicitly authorized TVA to pursue. Thus, when TVA, an agency and instrumentality of the United States, is acting pursuant to one of its governmental purposes and functions, it falls squarely within the rule articulated by the Sixth Circuit that "in light of the doctrine of sovereign immunity, [courts lack] the authority to impose punitive fines or assessments upon an instrumentality of the United States, absent an express waiver of such immunity by Congress." *Commerce Fed. Sav. Bank*, 872 F.2d at 1248 (quoting *Ault*, 256 U.S. at 563-65); *Smith v. Russellville Prod. Credit Ass'n*, 777 F.2d 1544, 1549-50 (11th Cir. 1985); *Painter v. TVA*, 476 F.2d 943, 944 (5th Cir. 1973) (stating that TVA could not be held liable for punitive damages, on grounds that a federal agency or instrumentality cannot be held liable for punitive damages unless Congress makes a special provision permitting such damages).

Moreover, while Plaintiffs argue that no "clear showing" can be made for the proposition that punitive damages should not be available against TVA, the Court respectfully disagrees. For instance, the imposition of punitive damages would be inconsistent with the statutory schemes and express intentions of Congress subsequent to the TVA Act. Plaintiffs assert that Congress "deliberately deprived TVA" of the protections afforded other federal agencies in the FTCA, such as protection from punitive damages and jury trials, and that Congress does not equate TVA with federal agencies for purposes of tort law. However, Congress has bestowed a number of protections provided in the FTCA to TVA and its employees for purposes of tort law. For instance, in 1988, the Senate amended

the Federal Employee Liability Reform and Tort Compensation Act,[55] an act which created a statutory mechanism through which tort actions against federal employees are transformed into actions against the federal government, to give TVA employees tort immunity identical to that given other federal employees within the scope of the Act. *See and compare* 16 U.S.C. § 831c-2, *with* 28 U.S.C. § 2679(b)-(d).  An award of punitive damages against TVA would be inconsistent with this congressional determination that TVA employees cannot be held liable for state law tort-related liability resulting from wrongful conduct within the course and scope of their employment—conduct that, under many state laws, justifies the imposition of punitive damages. *See* 16 U.S.C. § 831c.  Further, Congress has extended the protection afforded federal employees to TVA employees in other aspects, such as covering TVA employees under the Civil Service Reform Act and the Federal Employees Compensation Act. *See Jones v. TVA*, 948 F.2d 258, 262, 265 (6th Cir. 1991).

Finally, as stated above, the Sixth Circuit has unequivocally found, in addressing the issue of whether punitive damage can be assessed against "sue and be sued" federal agencies and instrumentalities, that such penalties are not permitted absent an express waiver of

---

[55] Pub. L. No. 100-694, 102 Stat. 4563 (1988).

immunity by Congress. *Commerce Fed. Sav. Bank*, 872 F.2d at 1247.[56] Plaintiffs have urged the Court to apply what Plaintiffs argue is a specific analysis for sue and be sued entities, one that would reach a different result. However, Plaintiffs have not given reason why the Sixth Circuit's determination of the issue of punitive damages and sue and be sued entities, using the *Burr/Loeffler/Meyer* analysis, was in error. Thus, given the Sixth Circuit's holding concerning this issue, the continuum of the *Burr* and *Loeffler* analysis in *Meyer*, the Court will not ignore prior case law and the statutory framework which designates TVA a federal agency and instrumentality, statutorily authorized to engage in power production for the general welfare of the community, and a sue and be sued entity against whom punitive damages are not available. As such, the Court finds that TVA is not liable for punitive damages.

## B.    Jury Demand Analysis

TVA has also moved to strike Plaintiffs' jury demands because, TVA asserts, there is no Seventh Amendment right to a jury trial against TVA in these cases and the TVA Act does not contain an express grant of a right to trial by jury in tort actions against TVA. Plaintiffs argue that TVA has again misconstrued the immunity of the federal government

---

[56] *Accord Sierra Club v. TVA*, 430 F.3d 1337, 1357 (11th Cir. 2005) (affirming "the district court's grant of summary judgment to TVA on the Sierra Club's claim for civil penalties for past opacity violations"); *Springer v. Bryant*, 897 F.2d 1085 , 1089 (11th Cir. 1990) (affirming dismissal of death action for punitive damages against TVA); *Heathcoat v. Potts*, 905 F.2d 367, 372 (11th Cir. 1990) (same); *Painter*, 476 F.2d at 944; *Landreth v. TVA*, No. 1:05cv188-R, 2006 WL 1793630, at * 1 (W.D. Ky. June 27, 2006)(dismissing the plaintiff's claim for punitive damages against TVA as a matter of law); *Fowler v. TVA*, 208 F. Supp. 828, 833 (E.D. Tenn. 1962)*, aff'd*, 321 F.2d 566 (6th Cir. 1963) (dismissing a claim of punitive damages against TVA).

with the immunity of federal "sue and be sued" entities and has failed to establish the "clear

showing" required under *Meyer* as to why TVA's waiver of immunity should not be

extended to trial by jury.

As the court explained in *Jones-Hailey Corp. v. TVA*, 660 F. Supp. 551 (E.D. Tenn. 1987):

> There is no Seventh Amendment right to a jury trial in suits against the United States. *Lehman v. Nakshian*, 453 U.S. 156, 160, 101 S. Ct. 2698, 2701, 69 L.Ed.2d 548 (1981). The federal government is immune from suit except to the extent it consents to be sued and then only on the narrowly construed terms to which it consented. *Id.* at 160-61, 101 S. Ct. at 2701; *Blackburn v. Comm'r of Internal Revenue*, 681 F.2d 461, 462 (6th Cir. 1982). The *Lehman* Court held that for a plaintiff to have a right to a jury trial in actions against the United States, Congress must not only have unequivocally waived the government's immunity to suit under the cause of action involved but must also have unambiguously granted the right to jury trials for that particular cause of action. *Lehman*, 453 [U.S.] at 168-69, 101 S. Ct. at 2706. In *Lehman*, the Court found that the plaintiff did not have a right to a jury trial in an action against the United States under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-34, because that statute did not include a clear, congressional expression of intent to permit juries in such actions. 453 U.S. at 168, 101 S. Ct. at 2705. The *Lehman* Court required an affirmative, statutory grant of the right to a jury in suits against the government in view of Congress' "normal practice of not providing a right to trial by jury when it waived the sovereign immunity of the United States." *Id.* at 168-69, 101 S. Ct. at 2706.

*Jones-Hailey Corp.*, 660 F. Supp. at 552; *see also Smith v. TVA*, No. 3:05-CV-386, 2006 WL

2192930 (E.D. Tenn. Aug. 1, 2006).

Plaintiffs urge the Court to find that, in light of *Meyer*, the above analysis is incorrect

as applied to federal agencies with "sue and be sued" clauses. However, as stated previously

in the Court's analysis of Plaintiffs' claims for punitive damages, *Meyer* did not alter the *Burr* and *Loeffler* analysis; rather, it reiterated and incorporated it.

Citing *Algernon Blair Indus. Contractors, Inc.*, 552 F. Supp. 972, 973 (M.D. Ala. 1982), Plaintiffs argue that *Lehman* is not applicable to cases against TVA. The *Algernon* court found that the *Lehman* analysis did not apply because the *Lehman* court based its denial of a jury trial on the sovereign immunity of the United States—immunity which, the *Algernon* court held, TVA did not enjoy. *Algernon*, 552 F. Supp. at 973. However, as the court in *Jones-Hailey* stated when presented with the same argument, "TVA does enjoy sovereign immunity, as evidenced by the fact that Congress had to waive this immunity in order to allow suits against the TVA." *Jones-Hailey*, 660 F. Supp. at 553. "This waiver does not, as *Algneron* holds, act as a complete and unqualified relinquishment of all aspects of sovereign immunity." *Id.*

Moreover, the reasoning of *Jones-Hailey Corp.* is in accordance with a decision by the Sixth Circuit in regard to another "sue and be sued" entity, the United States Postal Service. *See Davis v. Henderson*, No. 99-3028, 38 F.3d 420 (Table), 2000 WL 1828476 (6th Cir. Dec. 4, 2000). In *Davis*, the plaintiff brought an employment discrimination action against the United States Postmaster General, demanding a jury trial. *Davis*, 2000 WL 1828476, at * 1. The Sixth Circuit affirmed the district court's granting of the defendant's motion to strike, stating that:

> Even when Congress waives sovereign immunity, it does not
> simultaneously concede to a jury trial. Congress has provided for a
> general waiver of the Postal Service's sovereign immunity, but that

general waiver did not create a right to a jury trial. The second circuit explained that Congress has granted 'broad waivers of immunity [that have] subjected the federal government and its agencies to many types of liabilities and process . . . [but] the waiver of immunity does not, by itself, grant a right to trial by jury in an action against the federal government.' *Young v. United States Postal Serv.*, 869 F.2d 158, 159 (2nd Cir. 1989) (citations omitted). The Supreme Court has held that the right to a jury trial against an agency of the United States can only exist if congress 'clearly and unequivocally' grants such a right by statute. *Lehman*, 453 U.S. at 162.

*Davis*, 2000 WL 1828476, at * 1-2. Moreover, in *Young v. United States Postal Serv.*, cited by the *Davis* court, the Second Circuit, in discussing the cases of *Loeffler* and *Burr*, affirmed the district court's rejection of the holding in *Algernon* and embraced the analysis of the *Jones-Hailey* court. *In re Young*, 869 F.2d 158 (2nd Cir. 1989) (denying petition for mandamus from *Young v. U.S. Postal Serv.*, 698 F. Supp. 1139 (S.D. N.Y. 1988)).

Given this authority, this Court will follow the precedent of the Sixth Circuit and other courts and strike Plaintiffs' demand for a jury trial because, although TVA is subject to suit, Congress did not abrogate its status as a governmental agency and instrumentality, and the TVA Act does not contain an express grant of a right to trial by jury for tort claims against TVA. Accordingly, "[i]n the absence of any clear statutory grant of the right to jury trials, none is available. The jury right in actions against the federal government, and hence, TVA, may not be implied." *Jones-Hailey Corp.*, 660 F. Supp. at 552.

## VIII. CONCLUSION

For the foregoing reasons, Defendant TVA's Motion to Dismiss or for Summary Judgment [Doc. 41] is hereby **GRANTED** to the extent Plaintiffs' tort claims pertain to TVA's policy decision to build and keep in operation the Swan Pond facilities; **GRANTED** to the extent Plaintiffs' claims pertain to TVA's removal and remediation conduct following the coal ash spill; and **DENIED** to the extent Plaintiffs' tort claims pertain to TVA's use, maintenance, and upkeep of the Swan Pond facilities. TVA's request that the Court dismiss the inverse condemnation claims of the *Blanchard* plaintiffs, the *Raymond* plaintiffs, and the *Scofield* plaintiffs is hereby **DENIED.** Further, TVA's Motions to Dismiss All Claims for Punitive Damages Against TVA and to Strike All Jury Demands Against TVA [Doc. 58] is hereby **GRANTED** and Plaintiffs' claims for punitive damages are **DISMISSED** and the Court **STRIKES** Plaintiffs' requests for a jury trial.[57]

IT IS SO ORDERED.


s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE

---

[57] This Memorandum Opinion and Order resolves the following motions in the seven captioned cases:

| | |
|---|---|
| *Mays v. TVA*, 3:09-CV-6 | Docs. 38, 48 |
| *Blanchard, et al. v. TVA*, 3:09-CV-9 | Docs. 46, 62 |
| *Giltnane, et al. v. TVA*, 3:-9-CV-14 | Docs. 51, 69 |
| *Raymond, et al. v. TVA*, 3:09-CV-48 | Docs. 35, 47 |
| *Auchard, et al. v. TVA*, 3:09-CV-54 | Docs. 41, 58 |
| *Scofield, et al. v. TVA*, 3:09-CV-64 | Docs. 34, 46 |
| *Long, et al. v. TVA*, 3:09-CV-114 | Docs. 52, 86 |